IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 93-5470
_____


GINSBERG 1985 REAL ESTATE PARTNERSHIP,

                          Plaintiff-Counter
                          Defendant-Appellant


STATEWIDE INSURANCE AGENCY, INC., ET AL.,

                          Counter-Defendants-
                          Appellants.

     v.


     THE CADLE COMPANY

                          Defendant-Counter
                          Claimant-Appellee.

_____

Appeal from the United States District Court
for the Eastern District of Texas
_____

(November 23, 1994)

Before KING, JOLLY, and STEWART, Circuit Judges.

KING, Circuit Judge:

     Appellants Ginsberg 1985 Real Estate Partnership, Fred
Ginsberg, Sidney Ginsberg, Joe Ginsberg, and Statewide Insurance
Agency, Inc., appeal from the district court's grant of summary
judgment for The Cadle Company on a promissory note dispute.  We
vacate and remand that portion of the district court's judgment

that determines the amount of The Cadle Company's recovery, but we affirm the judgment in all other respects.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

On June 3, 1985, Ginsberg 1985 Real Estate Partnership ("Ginsberg 1985") executed a $250,000 promissory note ("Note") payable to the order of RepublicBank Tyler.  The Note specified that the interest rate to be applied was the prime interest rate charged by RepublicBank Dallas, plus one percent.  Payment of the Note was guaranteed by Statewide Insurance Agency, Inc. ("Statewide"), and individual guaranties were also provided by the partners of Ginsberg 1985 -- Joe Ginsberg, Sidney Ginsberg, Ted Ginsberg, and Fred Ginsberg.

On July 29, 1988, First RepublicBank Dallas -- the successor to RepublicBank Dallas -- was declared insolvent and was placed into receivership.  First RepublicBank Tyler -- the successor to RepublicBank Tyler -- also failed and was placed into receivership.[1]  Numerous assets of both failed banks, including the Note and guaranties at issue, were sold to JRB Bank, N.A. ("JRB").  JRB subsequently changed its name to NCNB Texas National Bank ("NCNB"), and NCNB later changed its name to NationsBank of Texas, N.A. ("NationsBank").

Sometime prior to March of 1991, a dispute arose between NCNB and Ginsberg 1985 over the allocation of payments on the Note between principal and interest, and NCNB allegedly advised Ginsberg

---

[1]  In both cases, the Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver.

1985 to cease making payments on the Note until the dispute could be resolved. Ginsberg 1985's last payment was made on March 1, 1991. NCNB subsequently transferred the Note and the related guaranties to the FDIC on November 30, 1991, and the FDIC then sold the Note and the guaranties to The Cadle Company ("Cadle") on June 22, 1992. Cadle requested payment on the Note and made demand upon the guarantors because of the cessation of payments.

In response, Ginsberg 1985 filed suit against Cadle in state court, seeking damages for usury, negligence, gross negligence, and breach of contract, as well as a judgment declaring the rights between the parties. Cadle removed the lawsuit to federal court on diversity grounds and filed a counterclaim against Ginsberg 1985 for the amount due under the Note. Cadle also asserted claims against Statewide and the individual guarantors on the basis of their guaranty agreements.

In district court, Cadle filed a motion for summary judgment, offering the affidavit of its account executive in support of the motion. In light of First RepublicBank Dallas's failure, the affidavit calculated the amount of past due interest using two different measures; first, the rate after default of 18% (the highest rate permitted by law), and second, the "continuing" rate derived by periodically substituting the prime rate of NationsBank and its predecessors. On August 4, 1993, the district court, without analysis, granted Cadle's motion in a "final judgment," and awarded Cadle the outstanding principal amount of the Note ($189,248.22), together with accrued interest at the default rate

of 18%.  The court ordered that Cadle was entitled to recover jointly and severally from Ginsberg 1985, Statewide, Joe Ginsberg, Sidney Ginsberg, and Fred Ginsberg.[2]  The court also denied all of Ginsberg 1985's claims against Cadle.  After unsuccessfully urging a motion for new trial or to amend the judgment, Ginsberg 1985, Fred Ginsberg, Sidney Ginsberg, Joe Ginsberg, and Statewide filed a notice of appeal.

## II.  STANDARD OF REVIEW

We review a summary judgment de novo, applying the same criteria employed by the district court in the first instance.  See Conkling v. Turner, 18 F.3d 1285, 1295 (5th Cir. 1994); FDIC v. Dawson, 4 F.3d 1303, 1306 (5th Cir. 1993), cert. denied, 114 S. Ct. 2673 (1994).  Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).  After the movant has presented a properly supported motion for summary judgment, the burden shifts to the non-moving party to show with "significant probative evidence" that there exists a genuine issue of material fact.  See Conkling, 18 F.3d at 1295.  A fact is "material" if its resolution in favor of one party might affect the

---

[2]     According to the appellants, Ted Ginsberg filed for bankruptcy protection, and as a consequence, Cadle amended its complaint to omit any claims against him.  Ted Ginsberg is not a party to this appeal.

4

outcome of the lawsuit under governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party.  See id.

### III.  ANALYSIS AND DISCUSSION

### A.  Interest Rate Selection

The primary issue in this appeal involves the interest rate to be applied after the failure of First RepublicBank Dallas.  As mentioned, the Note pegged the interest rate to the prime rate of First RepublicBank Dallas,[3] plus one percent.  Appellants contend that "[u]pon its failure, the First RepublicBank Dallas prime interest rate ceased to exist.  As a result, since July 29, 1988, the [N]ote has failed to specify an interest rate that is agreed upon by the parties."  According to the appellants, the Texas legislature has mandated a 6% rate of interest in the absence of a specified rate.[4]  Thus, because Cadle has charged greater than 6%

---

[3]      As previously discussed, the Note actually specified that the prime interest rate would be pegged to RepublicBank Dallas.  The parties agreed, however, that First RepublicBank Dallas was the successor to RepublicBank Dallas, and that the prime rate of First RepublicBank Dallas was applicable until the failure of that bank.

[4]      The statute provides the following:

When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable.

Tex. Rev. Civ. Stat. Ann. art. 5069-1.03 (Vernon 1987).

5

interest since the failure of First RepublicBank Dallas, appellants assert that Cadle has "committed usury" and is liable to Ginsberg 1985 for statutory usury penalties.

In response, Cadle contends that it was entitled to substitute an analogous prime interest rate for the prime interest rate of the failed First RepublicBank Dallas. Cadle not only calculated accrued interest at the 18% default rate, but it also calculated the amount of interest by referring periodically to the prime rate in effect at the banks that assumed many of First RepublicBank Dallas's assets and operations (i.e., NCNB and NationsBank).

Cadle's "substitution" approach, or its application of a "continuing" interest rate, is supported by Texas law and precedents in this circuit. In FDIC v. Blanton, 918 F.2d 524 (5th Cir. 1990), the contract between the parties specified a pre-maturity interest rate equal to the prime rate of First National Bank of Midland ("FNB-Midland"), plus one percent. FNB-Midland failed, and Blanton argued "that the applicable *post*maturity rate should be one percent because the contract specifies a *pre*maturity rate equal to FNB-Midland Prime plus one percent, and upon FNB-Midland's insolvency, FNB-Midland Prime evaporated, leaving one percent." Id. at 532.

We disagreed with Blanton's construction, initially noting that:

> [e]ven assuming the absence of a specific agreement as to postmaturity interest, settled Texas law permits the implication that the specified prematurity rate continues after postmaturity. Petroscience Corp. v. Diamond Geophysical, Inc., 684 S.W.2d 668, 668-69 (Tex. 1984) (per curiam). *Such an implication favors continuity in*

6

> *the rate of interest rather than elimination of interest*
> *upon the unforeseeable insolvency of the bank supplying*
> *the prime rate reference.*

Id. (emphasis added). Blanton, however, also denied the existence of any agreement on postmaturity interest; instead, like the appellants in this case, he urged the statutory rate of six percent applicable in the absence of an agreement between the parties. We rejected this contention as well, finding the six percent rate of article 5069-1.03 to be inapplicable. As the court stated, "[w]e conclude either that the parties did agree on a specific postmaturity rate, or that the evidence was such that the district court could properly fix the interest without reference to article 5069-1.03." Id.

Perhaps most importantly, we explicitly noted in Blanton that "[t]he trial judge could have applied an analogous prime rate as consistent with the intent of the parties," even though, as in the instant case, the contract between the parties pegged the interest rate to a specific banking institution that subsequently failed. Id. The district court in Blanton calculated prejudgment interest at ten percent based upon an implicit finding that the parties agreed to that rate. See id. at 532-33. In dicta, however, we approved an alternative interest calculation based upon the application of an analogous prime rate. As we noted:

> Counsel for FDIC indicated that the district court had
> not in fact applied a uniform 10% rate, but instead
> applied a fluctuating rate borrowed from the prime rate
> of Republicbank, the assuming bank of FNB-Midland. . . .
> *Application of the fluctuating rate would merely indicate*
> *that the trial judge had not accepted the ten percent*
> *postmaturity interest agreement, and had instead applied*
> *a prime rate borrowed from larger Texas banks upon which*

7

> *FNB-Midland had based its own prime rate.* The Florida
> bankruptcy court presiding over the Gihls Properties
> proceedings did precisely that, and expressly rejected
> application of the Texas six-percent legal interest
> statute.

Id. at 532-33 n.10.

Simply put, the Blanton analysis is persuasive in this case. The failure of First RepublicBank was an unforeseeable event, and Texas law favors continuity in the rate of interest. The parties intended for the promissory note to be governed by the prime rate of interest of First RepublicBank Dallas. Thus, the six percent legal rate is neither needed nor applicable, as we find an implicit agreement to use an analogous prime rate in the event of an unforeseeable "benchmark" bank failure.

In fact, in the context of the First RepublicBank Dallas failure, a federal district court approved the substitution of NCNB's prime rate for the prime rate of First RepublicBank Dallas. In FDIC v. Condo Group Apartments, the defendants argued that "NCNB charged a usurious rate of interest in using NCNB's prime rate to calculate interest rather than First Republic's prime rate," even though the defendants acknowledged that "since July of 1988, First Republic effectively had no prime rate or cost of funds rate of interest." As a result, the defendants argued that "the rate of interest should be zero, or alternatively, it should be set by [the] Court." 812 F. Supp. 694, 699 (N.D. Tex. 1992).

As regards the prematurity interest rate, the district court observed that the loan agreement in that case defined the interest "in terms of the prime rate or the cost of funds rate of First

8

Republic -- which are no longer in existence."  Id.  Nevertheless, the court specifically noted that "[c]ourts have approved use of a prime rate of another bank when the Note became an asset of the FDIC through a purchase and assumption agreement."[5]  Id. (citing FDIC v. La Rambla Shopping Ctr., 791 F.2d 215, 223 (1st Cir. 1986)).  In addition, the district court, citing Blanton, rejected the argument that the *post*maturity rate of interest evaporates "when the prime rate used for prematurity calculations no longer exists."  Condo Group Apartments, 812 F. Supp. at 699.  The court then approved the use of NCNB's prime rate in light of the failure of First RepublicBank Dallas.

In the instant case, appellants cite FDIC v. Cage, 810 F. Supp. 745 (S.D. Miss. 1993), in support of their position, but even the Cage court approved the substitution of an analogous prime rate in the context of a "benchmark" bank failure.  In Cage, the promissory note in question specified an interest rate of one and one-half percent "above the prevailing commercial prime rate of AmBank."  810 F. Supp. at 746.  AmBank failed, and the FDIC calculated interest based upon a substitute New York prime rate, plus the specified one and one-half percent.  See id.  The district court made the following observations:

> Obviously, a bank cannot be expected to provide in its
> notes for interest rates to be applied in the event the
> bank fails.  It would be unreasonable to find that the
> obligors under a note would escape all interest in a
> circumstance such as this.  Because the rate of interest

---

[5]  In the instant case, the promissory note and accompanying guarantees initially became assets of JRL pursuant to a Purchase and Assumption Agreement with the FDIC.

9

> is a term which is essential to a determination of the rights and duties of the parties and because the parties to this action understandably failed to specify the interest rate to be applied upon the failure of AmBank, it is left to the Court to determine a reasonable rate of interest. *The Court finds that substitution of the commonly used New York prime rate is reasonable under the circumstances of this case.*

Id. at 747 (emphasis added).

As the affidavit of Cadle's account executive indicates, accrued interest was calculated by substituting the prime rates of the banks that assumed many of First RepublicBank Dallas's assets. Although these banks were not necessarily the legal "successors" of First RepublicBank Dallas, the case law indicates that "successor" bank status is not required; rather, an *analogous* prime rate is all that is necessary, and Cadle's incorporation of the prime rates of the banks that assumed many of First RepublicBank Dallas's assets is analogous. As mentioned, we find that this "continuing" rate of interest approach is consistent with the intent of the parties and with existing, well-reasoned precedents, and this substitution of analogous prime rates is appropriate in light of the "benchmark" bank's failure. As such, appellants' usury claims are inapplicable, and it is unnecessary for us to reach the merits of appellants' arguments regarding the Note's savings clause. Cf. Blanton, 918 F.2d at 532 n.8 ("We do not address the requirements for a claim of usury because we . . . reject Blanton's claim that 6% was the legal limit.").

The Note between the parties in this case contained the following provision:

10

> If default be made in the payment of any installment of principal or interest under this Note or in the performance of any covenant in any instrument securing the payment of this Note, the entire principal balance and accrued interest owing hereon shall at once become due and payable without notice, at the option of the holder of this Note. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default.

The district court awarded the entire principal balance along with accrued interest at the 18% default rate -- implicitly finding, therefore, that Ginsberg 1985 had defaulted on the payment of one or more installments of principal and interest, and that Cadle had accelerated the payments on the Note. We believe, however, that there is a genuine and material factual dispute as to whether default and acceleration actually occurred, and nothing in the record conclusively eliminates this dispute such that Cadle would be clearly entitled to summary judgment. After all, appellants allege that NCNB advised Ginsberg 1985 to cease payment on the Note until the allocation problems could be resolved. If there is no default, then the district court's application of the 18% interest rate was improper, and interest should instead be awarded at the "continuing" or "substitution" rate. Normally, we would remand this issue to the district court to determine whether default and acceleration actually occurred. Cadle, however, stated at oral argument that it would simply prefer the lower interest award at the "continuing" or "substitution" rate, rather than having to further litigate the default issues on remand. Thus, because we find that the "continuing" rate of interest approach is consistent with Texas law and the intent of the parties, we vacate only the

11

"amount of recovery" portion of the district court's judgment, and we remand with instructions to enter judgment for Cadle for the principal amount of the Note, together with interest at the "continuing" rate, until the date of judgment. Cf. Conkling, 18 F.3d at 1296 n.9 ("This court may affirm a grant of summary judgment on any appropriate ground that was raised to the district court and upon which both parties had the opportunity to introduce evidence."). The court may reopen the record in the event that it is necessary to determine the "continuing" rate.

## B. Propriety of Usury and Illegality Defenses

Aside from the fact that we find no "commission of usury" by Cadle, Texas law does not permit a guarantor to escape its obligation by asserting a usury defense based on a usurious principal obligation. Despite the contentions of the appellants-guarantors, the Texas Supreme Court clearly held in Heaner that a guarantor may not assert usury defenses that stem from the underlying principal obligation. See Houston Sash and Door Co. v. Heaner, 577 S.W.2d 217, 222 (Tex. 1979). As the Texas Supreme Court explained:

> Article 5069-1.06 provides in plain language that the prescribed penalties be forfeited "to the obligor." Such language evidences the Legislature's intent that the usury defense remain personal to the debtor. Since statutes of a penal nature are to be strictly construed, the penalty forfeitures provided in Article 5069-1.06 are restricted to the immediate parties to the transaction creating the usury defense.

Id. Moreover, we have previously held that "[u]nder Texas law a guarantor cannot assert any claim of usury in the underlying obligation. Usury is a personal defense and may not be asserted by

12

a guarantor unless the contract with the guarantor also contains the usurious provision." <u>FSLIC v. Griffin</u>, 935 F.2d 691, 700 (5th Cir. 1991).  Because the state of the law has not changed, we may not now deviate from our holding in <u>Griffin</u>.  See <u>Broussard v. Southern Pac. Transp. Co.</u>, 665 F.2d 1387, 1389 (5th Cir. 1982) (en banc) ("[A] prior panel decision `should be followed by other panels without regard to any alleged existing confusion in state law, absent a subsequent state court decision or statutory amendment which makes this Court's [prior] decision clearly wrong.'") (quoting <u>Lee v. Frozen Food Express, Inc.</u>, 592 F.2d 271, 272 (5th Cir. 1979)).[6]

### C.  Validity of the Guaranty

Appellants also contest the validity of the guaranty executed by Sidney Ginsberg on behalf of Statewide.  Appellants claim that a corporation's power to execute a guaranty is limited by Article 1302-2.06(B) of the Texas Revised Civil Statutes, which provides in relevant part:

> [A]ny corporation shall have the power and authority to make a guaranty if the guaranty reasonably may be expected to benefit, directly or indirectly, the guarantor corporation. . . .  The decision of, or a decision made pursuant to authority granted by, the Board of Directors that the guaranty may reasonably be expected to benefit, directly or indirectly, the guarantor corporation shall be binding upon the guarantor corporation, and no guaranty made by a corporation in

---

[6]  Even though appellants are correct in their assertion that "[a] guaranty . . . may not be enforced if the underlying obligation is void for illegality," <u>Griffin</u>, 935 F.2d at 700, we have already concluded that Cadle's "continuing" rate of interest is not usurious.  Appellants have provided no additional evidence of illegality in the underlying Note, and after a review of the record, we also find no evidence of illegality.

> accordance with the provisions of this Section B shall be invalid or unenforceable as against such corporation, unless such guaranty is sought to be enforced by a person who participated in a fraud on the guarantor corporation resulting in the making of the guaranty or by a person who had notice of such fraud before he acquired his rights under the guaranty.

Tex. Rev. Civ. Stat. Ann. art. 1302-2.06(B) (Vernon Supp. 1994). According to the appellants-guarantors, "[w]ithout a resolution from the [Statewide] Board of Directors determining that the guaranty benefits the corporation, it cannot be assumed that the corporation possessed authority to execute the guaranty." Moreover, the appellants submitted a February 18, 1993 affidavit of Fred Ginsberg, current President of Statewide, who stated that "Sidney Ginsberg never had authority to execute that [June 3, 1985] Guaranty on behalf of Statewide." After analyzing the statutory language and the relevant precedents, we agree with Cadle's contention that "a decision by the [B]oard of [D]irectors is not required before the corporation has the authority to execute a guaranty."

First, the plain language of the statute does not indicate that a Board decision or resolution is mandatory. Indeed, the first sentence of the statute provides broad authority to a corporation to make a guaranty, as long as it reasonably benefits the corporation. There is no other requirement for an enforceable guaranty, and conspicuously absent from this case is any allegation by Statewide that the guaranty did not benefit the corporation. The language involving a Board decision is not phrased in terms of a requirement; instead, the language seems designed to benefit the

14

*lender* by insuring that the corporation cannot later escape its guaranty by asserting an *ultra vires* defense. Viewed in this light, the statute provides explicit protection to a lender who insists upon a formal Board declaration that the guaranty is reasonably expected to benefit the guarantor corporation; in such circumstances, the lender can insure, before disbursing any funds, that the guaranty shall be statutorily "binding upon the guarantor corporation." See, e.g., Diamond Paint Co. v. Embry, 525 S.W.2d 529, 535 (Tex. Civ. App. -- Houston [14th Dist.] 1975, writ ref'd n.r.e.) (noting that in article 1302-2.06(B), "[t]he Legislature [provided] that certain guaranties are neither illegal nor *ultra vires*"). Thus, a Board decision is not a statutory prerequisite before an enforceable guaranty can be made; instead, it provides a lender with a guaranteed enforcement mechanism if the lender chooses to require a formal Board decision or resolution.[7]

---

[7] An article in the Texas Tech Law Review also concludes that a Board decision is not a statutory prerequisite to creating a corporate guaranty:

> [A]rticle 1302-2.06(B) states that a guaranty made in accordance with section (B) shall not be "invalid or unenforceable." Therefore, the corporation wishing to avoid liability on its guaranty might argue by implication that a corporate guaranty not so made would be invalid or unenforceable. This argument ignores, however, the fact that section (B) grants authority for the making of guaranties. Even if a guaranty is not authorized under article 1302-2.06 and, therefore, is ultra vires, article 2.04 [of the Texas Business Corporation Act] should still apply. In addition, a corporate guaranty not made in accordance with section (B), but in compliance with section (A) or section (C), obviously would not be invalid. Finally, the statutory reference to a guaranty's being "invalid or unenforceable" apparently pertains only to the effect on enforceability of the types of fraud described in

15

Second, and perhaps more importantly, cases have approved the creation of a guaranty relying on apparent authority -- even after the enactment of article 1302-2.06(B) -- with no mention of a Board decision or resolution requirement.  The "Board decision" language was added in a 1973 amendment to article 1302-2.06(B), see Tex. Rev. Civ. Stat. Ann. art. 1302-2.06(B) (Vernon 1980) (historical notes), but some post-1973 cases have at least considered the use of apparent authority to create binding guaranties without mentioning any "Board decision" prerequisite.  See, e.g., Charles E. Beard, Inc. v. Cameronics Technology Corp., 729 F. Supp. 528, 531 (E.D. Tex. 1989) (considering whether a guaranty was created by apparent authority, and concluding that "[t]here was no evidence that there was actual or apparent authority vested in [employees] so as to bind the defendant to a contract guaranteeing . . . contractual performance . . . ."); Diamond Paint Co. v. Embry, 525 S.W.2d 529, 535 (Tex. Civ. App. -- Houston [14th Dist.] 1975, writ ref'd n.r.e.) (noting the conduct of corporate officers in executing a guaranty and concluding that "such conduct in evidence supported the finding of apparent authority" to create the guaranty).  In these cases, apparent authority provided the operative framework for considering whether a guaranty was validly

_____

section (B).

Terry W. Conner, Enforcing Commercial Guaranties in Texas: Vanishing Limitations, Remaining Questions, 12 **Tex. Tech L. Rev.** 785, 800 (1981) (footnotes omitted).  The article later notes that "it would seem clear that the failure of the guarantor's board of directors to make a determination that the guaranty benefits the corporation would not be detrimental if in fact the guaranty benefits the guarantor."  Id.

16

created; a "Board decision" requirement did not enter the analysis. Thus, we infer that a guaranty can be validly created without procuring a Board decision or resolution, as article 1302-2.06(B) does not mandate such a requirement.

Our conclusion is strengthened by the language of subsection E of article 1302-2.06, which states in relevant part that:

> [n]othing in Section B, C, or D of this Article is intended or shall be construed to limit or deny to any corporation the right or power to do or perform any act which it is or may be empowered or authorized to do or perform under any other laws of the State of Texas now in force or hereafter enacted.

Tex. Rev. Civ. Stat. Ann. art. 1302-2.06(E) (Vernon Supp. 1994). It is a fundamental tenet of agency law that "[t]he acts of [a corporation's] officers or agents can create apparent authority." Paramount Nat'l Life Ins. Co. v. Williams, 772 S.W.2d 255, 262 (Tex. App. -- Houston [14th Dist.] 1989, writ denied). As the above-cited cases indicate, the acts of a corporation's officers or agents can create a valid guaranty through the exercise of apparent authority. We will not disturb such settled principles of agency and corporations law without clearer statutory language indicating the necessity of a Board decision for creation of a guaranty. The language of subsection E affirms this position, as it explicitly indicates that subsection B was not intended to displace a corporation's common-law power to create a guaranty.

Because we conclude that a Board decision is not required to create a valid guaranty -- although obtaining one is clearly the better part of valor -- the only question is whether Sidney Ginsberg had apparent authority to execute the guaranty on behalf

17

of Statewide. The guaranty was signed "Sidney Ginsberg," and immediately below his signature, the guaranty noted that he was the "authorized officer" of Statewide Insurance Agency. Moreover, the guaranty was executed on June 3, 1985 -- the same day that the individual guaranties of the Ginsbergs were executed -- and no objection to Sidney Ginsberg's authority was raised until Fred Ginsberg's affidavit was signed on February 18, 1993. Thus, in this lawsuit, we find that a legitimate case for apparent authority has been made.

To rebut the case for apparent authority, appellants needed to present competent summary judgment evidence to show that it was unreasonable for Cadle and its predecessors to believe that Sidney Ginsberg was authorized to execute the corporate guaranty. See Restatement (Second) of Agency § 8 cmt. c (1958) ("Apparent authority exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized."). The only summary judgment evidence submitted in response by the appellants, however, was the statement in Fred Ginsberg's affidavit that "Sidney Ginsberg never had authority to execute that Guaranty on behalf of Statewide." This statement is simply not enough to raise a fact question to block the grant of summary judgment on apparent authority. The statement only serves to refute Sidney Ginsberg's *actual* authority, but the mere lack of actual authority does not factually or legally rebut the binding effect of *apparent* authority. See, e.g., Clark Advertising Agency v. Tice, 490 F.2d 834, 835-36 (5th Cir. 1974) (concluding that

18

where a president left detailed negotiation work to a comptroller and a vice-president, those two officers had apparent authority to bind the corporation, and the corporation was estopped from denying their authority, *regardless* of "[w]hether or not [the officers] actually had express or implied authority to bind [the corporation]"); Restatement (Second) of Agency § 159 cmt. c (1958) ("A person who is not authorized to make a contract on behalf of a principal but who has apparent authority to do so, subjects both the principal and the other party to liability *to the same extent as if the contract were authorized*.") (emphasis added). Thus, we conclude that the district court was correct in its grant of summary judgment for Cadle on the validity of the Statewide guaranty.

### D. Tort Claims

Appellants contend that Cadle and its "predecessors" have committed negligence and gross negligence in the application of payments to the amount due on the Note. According to the appellants, "Ginsberg Partnership has suffered damage in that excess interest has accrued due to the inflated principal balance thereby increasing the partnership's liabilities." In addition, the appellants argue that NCNB was negligent and grossly negligent in not promptly determining the proper amounts of interest and principal.

We agree, however, with Cadle's position that Ginsberg 1985 "did not come forward with any evidence that it suffered damages resulting from any alleged negligence." In response to Cadle's

19

summary judgment motion, the appellants relied heavily on the affidavit of Fred Ginsberg, but the affidavit failed to discuss any damages resulting from the alleged negligence, and it offered no evidence of any duty or breach of duty on the part of Cadle or NCNB.  No calculations of the allegedly "proper" allocation of principal and interest were submitted by appellants; thus, no comparison as to potential "damages" could be made with the calculations submitted by Cadle.  Indeed, Ginsberg 1985 was *aided* by the fact that NCNB did not require payments during the dispute over the allocation of principal and interest.  Simply put, upon our review of the record, we conclude that the partnership has failed to show any damages from the alleged mishandling of its account.  As a consequence, we agree with the grant of summary judgment on this issue.[8]

## IV.  CONCLUSION

For the foregoing reasons, we VACATE that portion of the district court's judgment that determines the amount of Cadle's recovery, and we REMAND with instructions to enter judgment for Cadle for principal and interest at the "continuing" rate.  In all other respects, however, the district court's grant of summary judgment for Cadle, and its corresponding denial of appellants' claims, is AFFIRMED.

---

[8]     Because we conclude that appellants' claims of usury, negligence, and gross negligence lack merit, we find it unnecessary to decide whether Cadle is immune from defenses based on the holder in due course and D'Oench, Duhme doctrines.

20