Betty J. BELL Plaintiff

v.

SOUTH DELTA SCHOOL DISTRICT,
James Tankson, individually, Georgia
C. Russell, individually, Estes Taplin,
individually Defendants

No. CIV.A.5:01 CV 268.

United States District Court,
S.D. Mississippi,
Western Division.

Jan. 29, 2004.

Preston D. Rideout, Jr., Abraham & Rideout, Greenwood, MS, for Betty J. Bell, plaintiff.

Mark James Chaney, Jr., Teller, Chaney, Hassel & Hopson, Vicksburg, MS, for South Delta School District, James Tankson, Georgia C. Russell, Estes Taplin, defendants.

## MEMORANDUM OPINION AND ORDER

BRAMLETTE, District Judge.

This matter comes before the Court on the defendants' Motion for Summary Judgment [docket entry no. 90–1]. After reviewing the motion, briefs, applicable statutory and case law, and being otherwise fully advised as to the premises, the Court finds that the defendants' Motion for Summary Judgment is well taken and shall be **GRANTED**.

## FACTS

The plaintiff submits several detailed affidavits which chronicle in depth the various episodes giving rise to this suit. Stated in the light most favorable to the plaintiff, the facts of the case are as follows.

Plaintiff Betty J. Bell, an African American female, was an instructor in the South Delta School District (hereinafter referred to as "District"), Mississippi, from 1977 until she resigned in October 2000. Ms. Bell has an undergraduate degree in Business Education from Mississippi Valley State University and an elementary education certificate from Delta State University.

Before her resignation in October 2000, Ms. Bell taught classes in the Vocational Education program. During the twelve years prior to this suit, Ms. Bell instructed students in the Business and Computer Technology Program (hereinafter referred to as "BCT"), an elective course for students in grades 10 through 12 that can be taken either for two or four semesters.

According to the plaintiff, she had a combative relationship with her superiors, including her immediate supervisor Defendant James Tankson, Director of Vocational Education. Over the years, most of the plaintiff's disagreements with Mr. Tankson

seemed to revolve around funding the BCT program. In 1995, however, the plaintiff discovered that Mr. Tankson had signed her name to an inventory list of equipment worth more than $80,000.00. After consulting with an attorney, the plaintiff sent Mr. Tankson a letter confronting him about the forged signature.[1]

During the late 1990's, the relationship between the plaintiff and Mr. Tankson allegedly further deteriorated after Mr. Tankson refused to allow the plaintiff to teach night classes and declined to appoint the plaintiff as an instructor in a summer youth program. After three straight years of being rejected to teach summer business courses, the plaintiff filed a complaint with Congressman Bennie G. Thompson, a member of the United States House of Representatives. Her complaint led to a meeting with Estes Taplin, the District Superintendent, and Mr. Tankson.[2] During that meeting, Mr. Tankson allegedly stated to the plaintiff, "Ms. Bell, you've taken me to every superintendent." [3] (Bell Aff. ¶ 34.)

In February 2000, Ms. Bell submitted a letter of intent to the District notifying school officials that she wished to return the following year as a BCT instructor. In March 2000, allegedly fearing that funding for the program would cease because of a drop in enrollment, school officials invited Ms. Cheryl Lott, Supervisor of Business Programs for the State Department of Education, to assist the plaintiff in improving the BCT program. A few weeks later, the plaintiff was issued a "benign" report de-

tailing minor deficiencies about the appearance of the classroom. (Bell Aff. ¶ 5.) The plaintiff insists she was told nothing about improving the program or increasing student enrollment. After the assistance visit by Ms. Lott, Mr. Tankson allegedly refused to talk to the plaintiff.

During March and April 2000, the only mode of communication between the plaintiff and her supervisor Defendant Tankson consisted of written correspondence, including memoranda directing the plaintiff to inventory the assets of the BCT program. On March 24, 2000, Mr. Tankson sent Ms. Bell three separate requests for the school's digital camera. On April 3, 2000, Mr. Tankson reprimanded the plaintiff for leaving campus. The plaintiff received a written "reprimand notwithstanding the fact that she had long standing permission to leave campus towards the end of the day to pick up her grandchildren from their nearby school." (Bell Aff. ¶ 8.) During the same period, Mr. Tankson denied numerous requisition requests submitted by Ms. Bell. Finally, on April 27, 2000, Mr. Tankson disapproved Ms. Bell's request to host a single year-end workshop recognizing student achievement and showcasing the BCT program to parents and prospective students. Instead of permitting Ms. Bell to host one workshop with students arriving en masse, as was allowed in previous years, Mr. Tankson required "students to come to the complex in four separate blocks." (Bell Aff. ¶ 9.)

---

1. In May 2000, the plaintiff reported the alleged forgery to the Sharkey County Sheriff's office. The police investigated the complaint, but the District Attorney decided not to prosecute Mr. Tankson.

2. The plaintiff's acquaintance with Superintendent Taplin was apparently just as contentious as her relationship with her supervisor. According to Ms. Bell, the animosity between

her and Defendant Taplin allegedly stemmed from a previous disagreement involving the Superintendent and the plaintiff's daughter, Ms. Angela Johnson, who had previously worked for Superintendent Taplin.

3. In fact, the plaintiff had filed written complaints about Mr. Tankson with the last three superintendents. (Defs.' Mot. for Summ. J., Ex. B–1, B–2, and B–3.)

A week later, on May 1, 2000, the plaintiff was notified in writing by Defendant Georgia C. Russell, Assistant Superintendent for Personnel, that she would teach a seventh grade Career Discovery vocational course at the District's Middle School during the following school term. Two weeks later, on May 14, 2000, the District offered the plaintiff a new contract for the 2000–2001 school year as a "vocational instructor." (Defs.' Mot. for Summ. J., Ex. A–2.) Soon thereafter, the plaintiff wrote Defendant Russell a letter stating that she believed her transfer was initiated by Mr. Tankson as a means of retaliation.

At a subsequent meeting, Defendant Russell informed the plaintiff that her transfer had nothing to do with her teaching performance. According to the plaintiff, Defendant Russell insinuated that the transfer was an attempt to harmonize the racial makeup of the instructors in the vocational programs. The plaintiff was replaced by Brenda Grant, a white teacher, and after the plaintiff was supplanted, the racial mix of instructors was allegedly 50% black and 50% white.

School officials offer a different explanation for their decision to transfer the plaintiff. According to school administrators, the plaintiff was replaced to alleviate concerns about a decrease in student enrollment among the BCT courses. Officials widely believed that changing teachers would inject vitality into the BCT program and increase student participation. Thus, the plaintiff was transferred and superseded by Brenda Grant, a teacher deemed better qualified than the plaintiff because she had a Master's Degree.[4]

Despite her desire to remain as the BCT instructor, on May 24, 2000, the plaintiff signed an employment contract for the upcoming academic year in which she agreed "to reassignment during the school term to any area for which a valid certificate is held." (Defs.' Mot. for Summ. J., Ex. A–2.) Concurrently, she wrote a letter to Superintendent Taplin requesting to remain as BCT instructor. In addition, she called Mr. Taplin. According to the plaintiff, in a testy telephone conversation, Mr. Taplin shouted that he needed no justification to transfer her. The plaintiff was shocked by the openly hostile reception she received. On June 9, 2000, the plaintiff was allegedly denied a hearing by the District's school board because, according to the board, it had the right to assign and reassign employees without granting a hearing.

In order to teach her new course, the plaintiff was required to attend a three week certification program beginning on June 6, 2000. However, the plaintiff did not attend the mandatory workshop, and thus became ineligible to instruct the seventh grade course to which she was recently assigned. The plaintiff vehemently denies that she was ever informed about the training, and school officials concede that repeated efforts to contact her about the certification program may have been "unsuccessful." (Russell Dep. at 59–60.)

Because the plaintiff was no longer eligible to teach the seventh grade class, on June 27, 2000, school officials transferred her to an eighth grade Computer Discovery Course, a course which had unexpectedly lost its pedagogue. Apparently school administrators were confident that the plaintiff would embrace this transfer because the new position involved working with computer related programs. Much to the chagrin of the administration, however, the plaintiff was unhappy about her second transfer. She complained and requested

---

4. Because Ms. Grant had earned a graduate degree, she was certified "AA" under the Mississippi State Department of Education regulations. In contrast, the plaintiff only had an "A" certification and was therefore considered less qualified than her replacement.

to meet with school officials; her request was denied.

Two days later, in an apparent attempt to appease the plaintiff, the defendants transferred the plaintiff yet again. This third transfer, like all the previous reassignments, occurred during the summer recess. On June 29, 2000, school officials moved the plaintiff from her eighth grade class to "the position of teacher at the South Delta Elementary School for the 2000—01 school term." (Defs.' Mot. for Summ. J., Ex. G.)

As mandated, the plaintiff reported to the South Delta Elementary school at the beginning of the academic year for a one-day teacher workshop. The plaintiff was initially assigned to teach a fourth grade class, but instead she assumed duties alongside her sister-in-law as an instructor teaching 800 students from pre-kindergarten through the fifth grade. She was scheduled to teach a compensatory course, which involved using a computer laboratory to instruct math, reading, and language studies. According to the plaintiff, the classroom equipment was in poor condition, leaving the plaintiff with the indelible impression that her most recent teaching position was specially "created" for her. (Bell Aff. ¶ 26.)

On August 7, 2000, when the new school term officially commenced, the plaintiff was absent. In lieu of appearing to teach on opening day, the plaintiff departed on sick leave and underwent surgery to remove a thyroid cyst. On August 8, 2000, she filed a Title VII race discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). The EEOC, in turn, conducted an investigation. In response to the charge of discrimination, school officials stated that they had discretionary right under Mississippi law to transfer and reassign teachers. The District also claimed that all transfer decisions involving the plaintiff were made by Defendants Taplin and Russell, both of whom are black. The District further asserted that the plaintiff appeared before the District's school board (consisting of two white and two black members), which unanimously upheld the decision to transfer the plaintiff. The EEOC was unable to conclude that the information it obtained during the course of its investigation established a violation of Title VII, and the plaintiff was issued a right to sue letter on September 11, 2000.

While on sick leave, the plaintiff alleges she was transferred once again. The defendants deny that this transfer ever occurred. According to the plaintiff, she was told about the transfer by a substitute teacher who was hired to instruct in her absence.

The plaintiff's sick leave ended on October 2, 2000. After using all of her accumulated leave days, plus thirty additional days at a special rate approved by the District, the plaintiff requested a second extension for leave. (Russell Aff. ¶ 11.) The request was denied, at which time the plaintiff accused the District of treating her differently because in the past a white cafeteria worker (Ms. Dianne Brown) had been granted additional leave time. The District denies the accusation. According to the District, the cafeteria worker in question did not receive preferential treatment because, unlike the plaintiff, the cafeteria worker used her accumulated leave days during her leave of absence. In contrast, it is undisputed that the plaintiff had already exhausted her accumulated leave when she requested an additional extension at a special rate.

On October 3, 2000, the Mississippi Association of Educators (hereinafter referred to as "MAE" or "Association") filed a grievance with the school board on behalf of the plaintiff. Based on the rapid succession of transfers, the Association's

complaint alleged that the District was retaliating against the plaintiff. The Association made three separate attempts to have the grievance heard by the school board. On February 18, 2001, the school board denied the plaintiff's request to reconsider any of her transfers.

On October 10, 2000, after being denied an extension of sick leave, the plaintiff submitted her letter of resignation, which took effect on October 31, 2000. Finally, on September 4, 2001, the plaintiff filed suit in this Court, alleging violations of her constitutional rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## DISCUSSION

### I. Legal Standard for Summary Judgment

A motion for summary judgment is appropriately granted when the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56(c). The moving party has the initial burden of identifying relevant portions of the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A contested fact is "material" when it has the potential to change the outcome of the case. *Ginsberg 1985 Real Estate Partnership v. Cadle Co.,* 39 F.3d 528, 531 (5th Cir.1994) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue is "genuine" if "the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." *Id.*

If the moving party sustains its burden, the burden shifts to the nonmoving party to show with "significant probative evidence" that a genuine issue as to a material fact actually exists. *Conkling v. Turner,* 18 F.3d 1285, 1295 (5th Cir.1994). To overcome summary judgment, the nonmoving party must do more than simply rely on the pleadings or merely rest "upon conclusory allegations, improbable inferences, and unsupported speculation." *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1449 (5th Cir.1993). The non-movant must "designate specific facts showing the existence of a genuine issue for trial." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. "The mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment." *Id.* at 252, 106 S.Ct. 2505. Moreover, the nonmoving party must make a showing sufficient to establish the existence of an essential element of its case, an element on which it will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

In light of the facts presented by the nonmoving party, along with any undisputed facts, this Court must decide whether the moving party is entitled to judgment as a matter of law. When deciding a motion for summary judgment, the evidence submitted by the nonmoving party is presumed valid, and all reasonable inferences that may be drawn from that evidence must be drawn in favor of the party opposing summary judgment. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. The district court, therefore, must not "resolve factual disputes by weighing conflicting evidence, ... since it is the province of the jury to assess the probative value of the evidence." *Kennett–Murray Corp. v. Bone,* 622 F.2d 887, 892 (5th Cir.1980). Summary judgment is improper where the court merely believes it unlikely that the non-movant will prevail at trial. *National Screen Serv. Corp. v. Poster Exchange, Inc.,* 305 F.2d 647, 651 (5th Cir.1962). By

contrast, summary judgment for the moving party is only proper when a rational jury, looking at the record as a whole, could not find for the nonmoving party. *Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## II. Equal Protection

According to the plaintiff, school officials violated her rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. As presented to the Court, the plaintiff's claim for racial discrimination, pursuant to 42 U.S.C. § 1981 or § 1983, arises out of either her transfer, denial of sick leave, or constructive discharge. In the alternative, she argues that the defendant selectively treated her compared to other similarly situated persons and that the selective treatment was based on a malicious or bad faith intent to injure her.

▆▆▆ In this Circuit, "[e]mployment discrimination claims brought under 42 U.S.C. § 1981 or § 1983 are analyzed under the evidentiary framework applicable to claims arising under Title VII of the Civil Rights Act of 1964, as amended at 42 U.S.C. § 2000e *et seq.*" *Lawrence v. Univ. of Texas Medical Branch at Galveston*, 163 F.3d 309, 311 (5th Cir.1999). In employment discrimination cases, a plaintiff must show intentional discrimination, a burden which can be met by presenting either direct or indirect evidence of discrimination.

▆▆▆ Lacking direct evidence of discrimination, this Court analyzes the plaintiff's claim of race discrimination under the burden-shifting paradigm set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas*, a plaintiff can create a presumption through circumstantial evidence that the defendant unlawfully

discriminated against her. In situations where the plaintiff must prove her case by indirect evidence, as here, she "must first establish a *prima facie* case of discrimination." *Auguster v. Vermilion Parish School Board*, 249 F.3d 400, 402 (5th Cir. 2001). The "burden of production" then "shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action." *Id.* If the defendant is able to produce a justification, then the plaintiff may produce evidence to show that the defendant's articulated reason is merely pretext and that the defendant's adverse employment action was motivated by racial discrimination. *Id.* "[T]hat showing, coupled with the *prima facie* case, will be sufficient in most cases to survive summary judgment." *Id.*

### A. Transfer

▆▆▆ The plaintiff claims that she was "demoted" when she was transferred from her long-term position as BCT instructor to seventh grade Career Discovery Instructor. When a plaintiff alleges employment discrimination as a constitutional violation under 42 U.S.C. § 1983, she must establish a *prima facie* case by demonstrating that: (1) she is within a protected class; (2) she was qualified for the position she occupied; (3) she suffered an adverse employment action; and (4) the position she occupied was filled by someone outside the protected class. *Lee v. Conecuh County Bd. of Educ.*, 634 F.2d 959, 962 (5th Cir.1981).

The plaintiff satisfies her *prima facie* case of race discrimination in part only. She belongs to a protected class because she is African American, and the position she occupied was filled by someone outside the protected class. There is little dispute from the record that she was qualified for the position as BCT instructor; she had served in that capacity for 12 years. The

plaintiff's case falters, however, because she cannot demonstrate that her transfer was an adverse employment action.

■ The plaintiff maintains that her transfer to teach seventh grade was the equivalent of a demotion and therefore constituted an adverse employment action. To prove that a transfer was an adverse employment action, the plaintiff "must produce enough evidence to allow a reasonable trier of fact to conclude that, when viewed objectively, the transfer caused harm to" her, " 'sufficiently serious to constitute a constitutional injury.' " *Serna v. City of San Antonio*, 244 F.3d 479, 483 (5th Cir.2001) (quoting *Breaux v. City of Garland*, 205 F.3d 150, 152 (5th Cir.2000)).

■ A job transfer may, under certain circumstances, qualify as an adverse employment action. *Serna*, 244 F.3d at 482. For example, in *Forsyth v. City of Dallas*, 91 F.3d 769 (5th Cir.1996), the United States Court of Appeals for the Fifth Circuit held that transferring law enforcement officers from one position to another, with different duties involving less interesting work, less responsibility, less prestige, and less favorable working hours, was an adverse employment action. In that case, the court also found that the police department had traditionally transferred officers into the less desirable night patrol unit as a form of discipline. *Forsyth*, 91 F.3d at 774.

Similarly, in *Harris v. Victoria Independent School District*, 168 F.3d 216, 220–21 (5th Cir.1999), the court held that the plaintiffs, who had been transferred without an accompanying cut in pay or benefits but with an accompanying reprimand, suffered adverse employment actions. In *Harris*, one plaintiff-teacher was transferred in mid-term to a different high school to teach the same subjects, and another plaintiff-teacher was moved to an alternative learning center for disruptive students to teach subjects and grade levels

he had not taught before. Both transfers were intended to be disciplinary in nature and came with written reprimands which were placed in the plaintiffs' personnel files.

Obviously, not all job transfers constitute an adverse personnel action. For instance, in *Serna,* the court held that a job transfer without an accompanying decrease in compensation or disciplinary action could not amount to an adverse employment action. The court found that the plaintiff failed to present evidence which when viewed objectively would demonstrate that the job transfer amounted to a form of discipline, a demotion, or a reduction in pay or benefits.

■ An adverse employment action may or may not entail economic loss, but there must be a link between the discrimination and some tangible job benefits such as compensation, terms, conditions, or privileges of employment. *Burger v. Central Apartment Management, Inc.,* 168 F.3d 875, 879 (5th Cir.1999). It is insufficient for a plaintiff to show merely that she has been transferred from a position she likes to one she dislikes or otherwise considers less desirable. *Serna,* 244 F.3d at 483. In other words, the plaintiff must demonstrate that she "has suffered some serious, objective, and tangible harm as a result of ... [her] transfer." *Id.* "[P]ersonal preferences and subjective perceptions of the plaintiff are insufficient to establish that ... [her] transfer inflicted constitutional injury." *Id.*

Here, the plaintiff argues that her transfer was an adverse employment action because her new position as Career Discovery Instructor required less skill than her previous position as BCT instructor and because she had no recent experience teaching seventh grade. However, the undisputed facts in this case do not support the plaintiff's argument that she suffered

an adverse personnel action. She has submitted no evidence that her final employment contract was inferior to her contract as BCT instructor. In fact, her new position was virtually identical to her former position in terms of pay, benefits, and working conditions, including privileges and status.

Additionally, there is no evidence to suggest that the plaintiff's transfer was generally considered to be a demotion or any kind of punishment, and her transfer was made without an accompanying written or oral reprimand. Before signing her final employment contract, she was informed by school officials that she would be transferred to the seventh grade teaching position. While she vocally objected to the transfer, she signed the contract offered to her by the school, a contract which did not diminish her salary or employment benefits. In that contract, she agreed to be reassigned during the school term to any area for which she held a valid certificate. At the time of her transfer, the plaintiff possessed an elementary education certificate.

Moreover, this Court acknowledges that "federal courts should be extremely hesitant 'to invade and take over' in the area of education; a federal court is not the appropriate forum in which to seek redress over 'faculty disputes concerning teaching assignments, room assignments, administrative duties, classroom equipment, teacher recognition, and a host of other relative-ly. trivial matters.'" *Harris*, 168 F.3d at 220–21.

■ The plaintiff has provided no evidence, beyond her subjective belief, that her transfer was a demotion or otherwise an adverse employment action. Thus, the plaintiff cannot demonstrate a *prima facie* case of intentional discrimination, and the defendants are entitled to summary judgment on this claim.[5]

## B. Denial of sick leave

■ The plaintiff accuses the defendants of discriminating against her because of her race by denying her request for additional sick leave at a special rate. She alleges that in the past the District had approved a similar request by a white cafeteria worker.

The District, through Defendant Russell, states that the plaintiff's request for a *second* extension of sick leave at a special rate was denied in accordance with school policy. The District's denial of an additional extension at a special rate only meant that an amount equal to the plaintiff's daily pay rate would be deducted from her monthly salary for each day that she was absent beyond her initial 30–day extension. The District refutes the plaintiff's claim that a white cafeteria worker was granted a second extension of sick leave at a special rate. According to the District, and not refuted by the plaintiff, the white employee in question had used her accumulated leave in conjunction with

---

5. Even if this Court assumes for summary judgment purposes that the plaintiff has established a *prima facie* case and analyzes the evidence only on the issue of pretext, the Court still concludes that the District is entitled to summary judgment. Here, the District asserts, as one of its legitimate, non-discriminatory reasons, that it transferred the plaintiff so a better qualified teacher could instruct the BCT courses. The plaintiff's replacement, Ms. Grant, had earned a Master's Degree and therefore was deemed "AA" certified. The plaintiff, as a recipient of a Bachelor's Degree, was merely "A" certified, a lower certification under the regulations issued by the Mississippi State Department of Education. The plaintiff fails to establish a genuine issue of material fact as to whether the District's proffered reason for the transfer was the true reason. In fact, the plaintiff does not argue that this particular explanation was pretextual.

a leave of absence. Here, the plaintiff had already exhausted her accumulated leave when she requested additional leave at a special rate.

Even assuming that the plaintiff has satisfied the elements of her *prima facie* case for a claim of race discrimination, which this Court reiterates she has not, the defendants have offered a legitimate, non-discriminatory reason for their action. School policy did not authorize the plaintiff, who had already exhausted her accumulated leave, to take a second extension of sick leave at a special rate. The Court finds that this reason satisfies the defendant's burden of production, negates the presumption of discrimination created by the plaintiff's *prima facie* case, and obligates the plaintiff to point to evidence in the record that proves or at least raises an issue of pretext.

The plaintiff provides the Court with no evidence that this reason was a pretext for discrimination. The plaintiff's mere speculation that she was treated differently from a white employee is insufficient to create a genuine issue of fact regarding the District's articulated reason for its decision. Thus, on this claim, the defendants are entitled to summary judgment.

## C. Constructive Discharge

▮▮▮ Next, the plaintiff claims that her resignation was in fact the product of racial discrimination and thus amounted to constructive discharge, which, like a termination, is an adverse employment action that would satisfy the plaintiff's *prima facie* case.

▮▮▮▮ A constructive discharge occurs when the employer makes the working conditions so difficult, unpleasant, or intolerable that a reasonable employee would be feel compelled to resign or retire. *McCann v. Litton Systems, Inc.*, 986 F.2d 946, 951 (5th Cir.1993). In determining whether working conditions are intoler-

able, this Court considers a variety of factors, including "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status] ...." *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir.2000) (quoting *Barrow v. New Orleans Steamship Ass'n*, 10 F.3d 292, 297 (5th Cir.1994)). The test is objective—that is, not whether Ms. Bell felt compelled to resign, but whether a reasonable employee in her situation would have felt so compelled. *Jett v. Dallas Indep. School Dist.*, 798 F.2d 748, 755 (5th Cir., 1986), *modified on other grounds*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989).

The key to defeating this motion, therefore, is for the plaintiff to show that there is a question of fact as to whether her transfers were so intolerable that a reasonable person in her situation would have felt compelled to resign. From the pleadings, memoranda, and copious affidavits filed by the plaintiff, the alleged intolerable conditions were (1) the successive transfers during the summer break to other teaching positions and (2) the new job assignments required the plaintiff to instruct classes which she had no recent experience teaching. An objective person cannot find that these conditions were so difficult, unpleasant, or intolerable that a reasonable employee would have felt compelled to resign.

In *Jett*, the United States Court of Appeals for the Fifth Circuit stated that a transfer or demotion in some instances may constitute a constructive discharge, but concluded that the plaintiff's transfer

to another school was not so intolerable that a reasonable person would have felt compelled to resign. The court held that the plaintiff was not constructively discharged even though he was removed from the posts of head coach and athletic director, positions he had held for thirteen (13) years, and he was moved to a position as the freshman football coach. The court noted that a constructive discharge cannot be based upon the employee's subjective preference for one position over another, and the appellate court explained that, despite the plaintiff's desire to continue in his current coaching position, his working conditions were not so difficult, unpleasant, or intolerable that he had no choice to resign. *See, e.g., McCann,* 986 F.2d at 952 (holding that employee was not constructively discharged merely because he faced a slight decrease in pay (12%) coupled with a loss of some supervisory responsibilities); *Jurgens v. E.E.O.C.,* 903 F.2d 386, 392 (5th Cir.1990) (concluding that employee had not been constructively discharged simply because his new position, which involved a decrease in pay and supervisory responsibilities, was subjectively undesirable, but was not inherently demeaning, especially since it was offered as part of a non-discriminatory reorganization); *Kelleher v. Flawn,* 761 F.2d 1079, 1086–87 (5th Cir.1985) (finding that employee was not constructively discharged when he was reassigned from lecturer to a non-teaching position, in light of the subsequent reassignment of all other graduate student assistant instructors to non-teaching positions).

In the case at bar, the plaintiff's evidence does not raise a material question of fact with respect to whether her transfers created an objectively intolerable working environment. Significantly, most of the constructive discharge factors were not present here.[6] The plaintiff was never demoted. She did not experience a reduction in salary or benefits in any of her new positions. Her reassignments did not involve menial or degrading work; she was teaching classes for which she was certified. Notably, before signing her employment contract, the plaintiff was informed she would be transferred from the BCT program. She then signed a contract in which she agreed to be transferred to any position for which she was certified. It is also worth noting that all reassignments occurred during the summer, before the academic year began.

The Court acknowledges that the plaintiff might have preferred teaching the BCT courses. It is also quite evident that each subsequent transfer was as unappealing to the plaintiff as her initial move from the BCT program. However, an objective person could not find that the conditions were so intolerable that a reasonable employee would have felt compelled to resign. Consequently, the Court concludes that the defendants are entitled to summary judgment on the plaintiff's claim for damages on the basis of constructive discharge.

### D. Selective Enforcement

■ The plaintiff's final claim revolves around allegations that her "selective treatment" was based on a malicious or bad faith intent to injure her, violating her right to equal protection as guaranteed by the Fourteenth Amendment of the United States Constitution.

■ The Equal Protection Clause requires that those similarly situated should be treated alike. Under the Equal

---

6. The plaintiff insinuates that school officials harassed her and forced her to choose between alternatives that were less favorable than her former status. There is simply no objective evidence that any of the school officials intended to badger, harass, or humiliate Ms. Bell.

Protection Clause, an individual can bring a claim for "selective enforcement" of an otherwise valid law or regulation. *Beeler v. Rounsavall,* 328 F.3d 813, 817 (5th Cir. 2003). " 'The conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation.' " *Id.* (quoting *Allred's Produce v. U.S. Dep't of Agric.,* 178 F.3d 743, 748 (5th Cir.1999)). " '[T]o successfully bring a selective prosecution or enforcement claim, a plaintiff must prove that the government official's acts were motivated by improper considerations, such as race, religion, or the desire to prevent the exercise of a constitutional right.' " *Id.* (quoting *Bryan v. City of Madison,* 213 F.3d 267, 277 (5th Cir.2000)); *see also Allred's Produce,* 178 F.3d at 748 ("[I]t must be shown that the selective enforcement 'was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.' ").

In the instant case, the plaintiff advances a particular type of claim under the selective enforcement doctrine. The plaintiff alleges that she is a "class of one," that the government intentionally treated her "differently from others similarly situated," and "that there [was] no rational basis for the difference in treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

■ As a prerequisite to her equal protection claim, the plaintiff must prove that similarly situated individuals were treated differently. *Bryan,* 213 F.3d at 276. In other words, the plaintiff needs to identify other similarly situated individuals who were treated differently. *See, e.g., Presnick v. Town of Orange,* 152 F.Supp.2d 215, 224–25 (D.Conn.2001) ("Class of one plaintiffs are not relieved from the burden of showing that the other similarly situated people were treated differently."). Here, the plaintiff has failed to make such a showing.

The plaintiff also argues that the unequal treatment in her case is the result solely of a vindictive campaign by certain school officials to force her to resign.

■ Recently, the United States Court of Appeals for the Fifth Circuit reiterated "that personal vindictiveness *might* be an improper motive in a selective enforcement case." *Beeler,* 328 F.3d at 817. (Emphasis added.) The court also stated that it " 'never specifically addressed whether such a motive would be enough to support an equal protection claim without some other class-based discrimination.' " *Id.* (quoting *Bryan,* 213 F.3d at 277, n. 18). The federal appeals court then articulated the following:

The "text of the Equal Protection Clause, the history leading to its adoption, [and] a century of jurisprudence that has in the main interpreted the clause to prohibit only disparate treatment based upon group or class factors" *suggest that personal vindictiveness by itself is insufficient as an improper motive in the absence of some other class- or group-based discrimination.*

*Id.* at 818 (quoting Timothy Zick, *Angry White Males: The Equal Protection Clause and "Classes of One,"* 89 KY. L.J. 69, 75) (2000/2001). (Emphasis added).

Other circuit courts have recognized that equal protection claims, even if not class-based, could succeed on proof that a defendant's selective treatment was based on a malicious or bad faith intent to injure a person. *See, e.g., Yerardi's Moody St. Restaurant & Lounge, Inc. v. Board of Selectmen,* 878 F.2d 16 (1st Cir.1989); *LeClair v. Saunders,* 627 F.2d 606 (2nd Cir. 1980); *Esmail v. Macrane,* 53 F.3d 176 (7th Cir.1995).

■ As discussed above, to establish a vindictive action equal protection claim,

"the plaintiff must demonstrate that the government is treating unequally those individuals who are *prima facie* identical in all relevant respects and that the cause of the differential treatment is a totally illegitimate animus toward the plaintiff by the defendant." *Albiero v. City of Kankakee,* 246 F.3d 927, 932 (7th Cir.2001) (internal quotations omitted). Because a vindictive action equal protection claim, unlike its traditional counterpart, requires scrutiny of the government's actual subjective motivation, granting summary judgment, as a general rule, would be improper.

The plaintiff spends considerable effort attempting to convince this Court that numerous material facts are in dispute which suggest that the plaintiff's selective treatment was a spiteful effort by the defendants to force her to resign. Despite the plaintiff's efforts to demonstrate a malevolent intent among the defendants, the plaintiff still must identify those individuals who are *prima facie* identical to her in all relevant respects. However, she provides this Court with no competent evidence of fellow teachers who were similarly situated to her and yet treated differently. Because the plaintiff cannot make a showing sufficient to establish the existence of an essential element of her case, the defendants are entitled to summary judgment.

Even if the plaintiff were able to show that similarly situated teachers were treated differently, the Court cannot find the necessary precedential support within this Circuit for the plaintiff's novel claim. The plaintiff has advanced an equal protection claim which is not related to any race-based discrimination. Rather, her equal protection argument is based on personal vindictiveness without any type of class-based discrimination. Because the United States Court of Appeals for the Fifth Circuit has not expressly adopted this type of equal protection argument, it is this Court's opinion that the defendant is entitled to summary judgment on this claim as well.

## CONCLUSION

Based on the reasoning and authority set forth above, the Court finds that the defendants' Motion for Summary Judgment is well taken and should be granted. Accordingly,

IT IS HEREBY ORDERED that the defendants' Motion for Summary Judgment [docket entry no. 90–1] is **GRANTED.**

A separate final judgment dismissing the plaintiffs' civil action with prejudice shall issue in accordance with Fed.R.Civ.P. 58.