IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-60305
_____

STEVE BRYAN,

Plaintiff-Appellant,

versus

THE CITY OF MADISON, MISSISSIPPI;
MARY HAWKINS, Individually and in
her official capacity as Mayor of
Madison, Mississippi; TIMOTHY L.
JOHNSON, Individually and in his
official capacity as Alderman and
elected public official of the
City of Madison, Mississippi;
LISA CLINGAN-SMITH, Individually
and in her official capacity as
Alderman and elected public
official of the City of Madison,
Mississippi,

Defendants-Appellees.

_____

Appeal from the United States District Court for the
Southern District of Mississippi
_____

June 9, 2000

Before JOLLY and DeMOSS, Circuit Judges, and DAVID D. DOWD,[*]
District Judge.

E. GRADY JOLLY, Circuit Judge:

Steve Bryan, a developer, wanted to build some apartments in

Madison, Mississippi, so he contracted to buy some land that was

_____

[*]District Judge of the Northern District of Ohio, sitting by
designation.

zoned for apartments and began the process of submitting his plan to the mayor and board of aldermen.  It was approved.  All he needed then was a building permit.  But after some 700 residents raised serious objections, all he got was grief.  In a protracted approval process, he was frustrated time and time again, principally by the mayor and her allies.  Even a state circuit court, which sided with Bryan, was unable to give him any significant help.  Finally, after some three years of various delays, miscues, and political maneuvers, his battle ended when all he had left was an expired contract to purchase.  That is when he came to the federal courts with this 42 U.S.C. § 1983 claim, arguing that the City of Madison and its officials had violated his due process rights under the United States Constitution.  He argues that the defendants deprived him of his property rights without due process of law.  Unfortunately, he had no property rights and accordingly we must turn him away.

I

The saga of this plot of land began, routinely enough, in 1987, when the mayor and board of aldermen rezoned the property to allow for construction of residential apartments.[1]  In 1990, the city adopted a new, comprehensive plan for development of the

---

[1]There is some dispute about whether this rezoning was conditional on a grant by the owner to the city of a forty-foot buffer along the property's eastern boundary, but resolving this question is not critical to the outcome of the case.

entire municipality.  Under this plan, the property maintained its classification allowing for development of an apartment complex.

At this point, Bryan unceremoniously entered the story.  He signed a contract with the owner of the plot to buy the land, with the purchase to close between March 22, 1993 and September 30, 1994.  In early 1991, he submitted a plan for the development of apartments on the property to the mayor and board.  The plan would provide 564 units, approximately ten units per acre.  The city approved the plan in March 1991 and the architectural design for the project two months later.  All that remained was to obtain a building permit.  And in October 1991, Madison's Public Works Director, Denson Robinson, wrote Bryan to say that the planned development complied with all city ordinances and that Madison was prepared to issue the permit.

By December 1991, however, Bryan still had not applied for a building permit.  Perhaps he should have acted more quickly.  On December 17, the city adopted a comprehensive rezoning ordinance, to be effective on January 16, 1992, as part of the implementation of the 1990 comprehensive plan.  This rezoning was significant for three reasons.  First, it repealed all earlier and inconsistent ordinances.  Second, while the property maintained its classification allowing for residential apartment development, the new zoning ordinance reduced the density restriction from ten to

3

7.5 units per acre.  Third, the new ordinance adopted a formal site plan review procedure.

At this point, Bryan finally applied for a building permit. But according to a Madison ordinance, the builder must seek the permit within six months of approval of the site plan.  Bryan had missed this deadline, so he was forced to resubmit his site plan for approval.  In early July 1993, therefore, Bryan amended his site plan to accord with the new density provision and resubmitted it.  The board of aldermen voted to approve the new plan in September 1993.

While Bryan was involved in that process residents became unhappy with what would have been Madison's first apartment complex, and organized a petition drive opposing the development. They collected over 700 signatures.  This expression of voters, naturally enough, provoked a response from Mayor Mary Hawkins: she vetoed the board's September approval of Bryan's site plan.  Bryan appealed this decision to the Circuit Court of Mississippi.[2]  In the meantime, the mayor and two aldermen, Timothy Johnson and Lisa Clingan-Smith, submitted a rezoning application to the city zoning commission that would have prohibited development of apartments.

[2]He pursued his appeal pursuant to Miss.Code.Ann. § 11-51-75, which provides for appeal from decisions of boards of supervisors and municipal authorities upon presentment of a bill of exceptions setting forth the basis for appeal.  In this case, the circuit court ultimately found that Bryan's plan was inadequate.

4

The commission rejected their application, however.  A group of residents calling themselves the "Madison Homeowners Association" then appealed the commission's decision to the mayor and board of aldermen, who had authority to hear this type of appeal.  After a public hearing, however, the board voted 3-2 to deny the mayor's rezoning application.

Two days later, in early November 1993, the mayor called four of the board members for an unscheduled meeting.  The mayor told them she was declaring the first vote invalid and called for another immediate vote, even though one of the board members was absent and none of the interested parties had notice of the meeting.  Two members of the board objected and left the room.  Undeterred, the mayor proceeded to count the two who had left as abstaining votes, thereby constituting affirmative votes.  She then announced that the rezoning had passed, 4-0.

The landowner, not Bryan, appealed this decision to the circuit court.  In its March 16, 1994 order, the court ruled that the rezoning had been improper and warned the mayor against using the site approval procedures to block a landowner from lawfully using his property in response to public clamor.  But the judge dismissed the appeal on the assumption that the parties would be able to work out their differences.  By this time, however, the dispute was beginning to develop solid traction that would not slip into compromise.

Two days later, on March 18, 1994, Bryan submitted a new site plan, which he later modified on April 7.[3]  On April 25, the planning and zoning commission voted to approve Bryan's plan subject to certain conditions.  The mayor and board took up the matter of the site plan on May 3, but left the issue unresolved until the next regular meeting, May 17.  At that May 17 meeting, the board again voted 3-2 to approve the plan, and directed city personnel to issue a building permit.  But the mayor again vetoed the board decision.

This pattern became script.  Bryan would appeal the mayor's veto before the circuit court, which would reverse the veto.  In doing so, the circuit judge would issue findings in Bryan's favor before remanding back to the board of alderman. [4] After another favorable vote for Bryan in that forum, the mayor would announce another veto based on some new problem with Bryan's plan.  Bryan would then appeal.

This pattern was temporarily interrupted at a hearing on June 13, 1995.  At that hearing, before the aldermen even had a chance to vote, the mayor withdrew the plan from consideration,

---

[3]During review of this plan, Madison's city engineer, Engineering Associates, Inc., advised the city of a potential conflict of interest.  The board of aldermen then voted unanimously to hire another firm, Southern Consultants, Inc., to review the plan.

[4]The district court held that these findings did not have preclusive effect, an issue that Bryan has not raised on appeal.

ostensibly to review the transcript of another board meeting held the night before during which a portion of Bryan's plan had been approved. But the mayor never made any attempt to obtain such a transcript.

By this point, Bryan's window for purchasing the property had closed, but it is not clear whether the circuit judge was aware of this development. Regardless, the judge eventually tired of the mayor's strategies. He determined that Bryan's plan complied with all city ordinances and directed the city to issue a building permit. The judge also imposed sanctions of $19,688.45 on the city for its repeated attempts to block Bryan's attempts to obtain a building permit.

At this point, nothing appeared to stand in Bryan's way. But on April 21, 1995, the property's owner wrote Bryan informing him that the contract period for purchasing the property had ended. The owner ordered Bryan to remove his equipment from the property and not to return. The owner later sold the property to a third party in 1996.

After this final reversal, Bryan filed a § 1983 suit in federal district court, alleging violation of his Fifth and Fourteenth Amendment rights. The suit named the city of Madison, the mayor, and the two aldermen (Johnson and Clingan-Smith) as defendants. Bryan and the defendants later filed summary judgment

7

motions, and the district court ruled in favor of the defendants, dismissing the suit.

## II

Because the district court ruled for the defendants on summary judgment, we review the judgment de novo, applying the same standard as the district court. Duffy v. Leading Edge Prods. Inc., 44 F.3d 308, 312 (5th Cir. 1995); Fed.R.Civ.P. 56. We therefore draw all factual inferences in Bryan's favor in order to determine whether the defendants are entitled to judgment as a matter of law. Degan v. Ford Motor Co., 869 F.2d 889, 892 (5th Cir. 1989).

## III

We first address whether the three individual defendants enjoy immunity from this suit.[5] The district court, in a thorough and considered opinion, concluded that they were entitled to absolute legislative immunity. We must disagree.

## A

Absolute immunity applies to activities, not offices. See Marrero v. City of Hialeah, 625 F.2d 499, 508 (5th Cir. 1980)("[I]t is the official function that determines the degree of immunity required, not the status of the acting officer."). Legislative immunity protects officials fulfilling legislative functions even

---

[5]The City of Madison itself does not enjoy immunity from suit, either absolute or qualified, under § 1983. Burge v. Parish of St. Tammany, 187 F.3d 452, 476 (5th Cir. 1999).

if they are not "legislators."  Hughes v. Tarrant County Texas, 948

F.2d 918, 920 (5th Cir. 1991).  And absolute immunity only protects

those duties that are functionally legislative, not all activities

engaged in by a legislator.  Id.

The first step in our analysis, therefore, is to determine

exactly what activities Bryan has challenged.  Bryan's brief and

his complaint discuss four types of such activities:[6]

(1) The mayor's repeated vetoes of Bryan's site and development plans.

(2) Delaying tactics by the mayor by blocking a decision on Bryan's various plans at board meetings.[7]

(3) The vote by the mayor and two aldermen to apply to themselves to rezone the property.[8]

(4) The events at the November 3, 1993 board meeting, where the mayor placed the rezoning decision back on the agenda without notifying the parties, and where she and the two

---

[6]We note that Bryan's brief often fails to enumerate what specific acts form the basis for his specific claims.

[7]In his complaint, Bryan charges that the mayor prevented the processing of a site plan he submitted to the board on March 18, 1994, though Bryan does not explain how the mayor accomplished this.  In his complaint, he points to further delay  when the board failed to reach a decision on his site plan at a meeting on May 3, 1994.  Again, there is no mention of how this was accomplished, or even who was to blame for the delay.  Finally, Bryan points to a decision by the mayor to remove consideration of Bryan's plan from the agenda at a June 13, 1995 board meeting, purportedly to obtain a transcript of an earlier proceeding.

[8]On September 13, 1993, the Madison zoning commission voted to deny the mayor's rezoning application.  The Madison Homeowner's Association appealed to the board of alderman, which then voted on November 1, 1993, to deny the rezoning application.

9

aldermen voted to rezone the property notwithstanding the board's earlier vote against rezoning.[9]

B

In Hughes v. Tarrant County Texas, 948 F.2d 918 (5th Cir. 1991), we discussed various legal standards for evaluating whether a particular activity is "legislative" rather than "administrative" and therefore protected by absolute immunity.[10]  We first looked to Cinevision Corp. v. City of Burbank, 745 F.2d 560, 580 (9th Cir. 1984), which held that "[a]dministration of a contract does not involve the formulation of a policy. . . . Rather, it is more the type of ad hoc decisionmaking engaged in by an executive."  We also considered a zoning case, Scott v. Greenville County, 716 F.2d 1409, 1423 (4th Cir. 1983), where the Fourth Circuit held that "[w]hen local zoning officials do more than adopt prospective, legislative-type rules and take the next step into the area of enforcement, they can claim only the executive qualified immunity appropriate to that activity."  We next turned to Cutting v. Muzzey, 724 F.2d 259, 261 (1st Cir. 1984), where the First Circuit denied legislative immunity protection to a zoning board that had placed conditions on the approval of a development: "It is not the

[9]The state court overturned the rezoning on Feb 10, 1994.

[10]Hughes was not a zoning or permit case.  The question before the court was whether county commissioners were entitled to absolute legislative immunity for refusing to compensate a district court clerk for his attorney's fees incurred in the course of his § 1983 suit against them.

enactment of an overall plan or the establishment of general policy, both of which could be said to be legislative in nature. . . . In our case the Planning Board merely decided to insist on completion of a particular road before granting approval of a specified proposed subdivision." We explained that the Cutting court had adopted two different tests in reaching its conclusion:

> The first test focuses on the nature of the facts used to reach the given decision. If the underlying facts on which the decision is based are "legislative facts," such as "generalizations concerning a policy or state of affairs," then the decision is legislative. If the facts used in the decisionmaking are more specific, such as those that relate to particular individuals or situations, then the decision is administrative. The second test focuses on the "particularity of the impact of the state action." If the action involves establishment of a general policy, it is legislative; if the action single[s] out specific individuals and affect[s] them differently from others, it is administrative.

Id. (citing Developments In the Law, 91 Harv.L.Rev. 1427, 1510-11 (1978). In Hughes, we did not choose any one of these particular standards, but instead used them as general guidelines.

C

Applying the same guidelines to the present case indicates that legislative immunity protects only one of the defendants' listed activities. The first challenged activity, the mayor's repeated vetoes, was non-legislative. In each instance, the mayor was vetoing a determination that Bryan's plan satisfied city zoning

11

ordinances or building requirements.  Such a determination does not involve the "determination of a policy."  Rather than constituting a prospective rule, an overall plan, or general policy, this determination entered the realm of "enforcement" with respect to "approval of a specified proposed" plan.  Finally, under the two Cutting tests, the determination was based on specific, particular facts and affected Bryan's development alone.

Thus, our conclusion is not inconsistent with our earlier decision in Hernandez v. City of Lafayette, 643 F.2d 1188 (5th Cir. 1981), where we held that a mayor's veto of a rezoning ordinance was protected by legislative immunity.  Zoning is general and prospective.  It directly affects the entire community.  In the present case, however, general rules are being applied to one specific piece of property.[11]  Calhoun v. St. Bernard Parish, 937 F.2d 172 (5th Cir. 1991) presents a closer case because it concerned spot zoning rather than a general zoning ordinance.  But spot zoning, even if it relates to a specific plot, is still a

---

[11]In some circumstances, the application of general rules to a specific case may be quasi-judicial in nature, and therefore entitled to absolute immunity for that reason.  The standard for judicial immunity is different, and is discussed in detail in Thomas v. City of Dallas, 175 F.3d 358, 362-63.  We are not aware that the defendants have raised this argument to this point, but the district court did not address it, and the defendants have not alluded to it in their brief.  For these reasons, the issue is not properly before us.

prospective amendment of a larger general plan. For that reason, it is legislative, while the vetoes in the case before us are not.[12]

Similarly, the second activity, where the mayor delayed decisions on approval of Bryan's plans at various board meetings, is non-legislative. The point at issue in those meetings was specifically and particularly related to the proposed development. Any decision to delay a vote on that issue, therefore, was also specific and particular.

The third challenged activity, the vote to apply for a rezoning, also appears non-legislative. This was not a vote to rezone. It was a vote to apply for a rezoning, just as private citizens are able to do. This type of activity is more like ad hoc decisionmaking than the formulation of a policy.

Based on these standards, however, we must grant legislative immunity for the events related to the November 3, 1993 board meeting, which is the fourth set of activities. These activities were irregular and inappropriate. But they were still legislative in nature because they involved a rezoning provision. It may be that at some point, when a legislature acts in a wholly irresponsible and undemocratic manner, its immunity for

---

[12]Our conclusion is consistent with that of the Eleventh Circuit, which has twice held that the denial of a permit constitutes an administrative rather than a legislative act. See Corn v. City of Lauderdale Lakes, 997 F.2d 1369, 1392 (11th Cir. 1993); Crymes v. Dekalb County, Georgia, 923 F.2d 1482, 1485-86 (11th Cir. 1991).

13

"legislative" acts dissipates because it is no longer operating as a legislature, as we understand the term.  But we are reluctant to conclude that this point has been reached here.[13]

D

We recognize that the mayor and aldermen may be entitled to qualified immunity for the activities that are not protected by legislative immunity.  But the district court did not need to address this issue, having concluded that legislative immunity applied, and it has not been fully briefed by the parties.  For that reason, we decline to address it at this point.

IV

We turn now to the substance of Bryan's specific claims--substantive and procedural due process violations, taking without just compensation, and equal protection violation.

---

[13]Immunity concerning the November 3 meeting is probably insignificant.  The state court overturned the rezoning just over three months later, so any impact on Bryan's efforts was minor.

In order to establish either a substantive or a procedural due process violation by claiming denial of a property right, Bryan must first establish a denial of a constitutionally protected property right.[14] See Spuler v. Pickar, 958 F.2d 103, 107 (5th Cir. 1992) (stating that a prerequisite to a substantive due process claim is the establishment of a constitutionally protected property right); Jackson Court Condominiums, Inc. v. City of New Orleans, 874 F.2d 1070, 1074 (5th Cir. 1989)(requiring a showing of a property right as a basis for a procedural due process violation). Such a showing, as we noted in Schaper v. City of Huntsville, 813 F.2d 709 (5th Cir. 1987), must be made by reference to state law. "The Constitution does not create property interests; 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" Schaper, 813 F.2d at 713 (quoting Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)); see also Bishop v. Wood, 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (stating that "a property interest in employment can, of course, be created by ordinance or by an implied contract . . . in

---

[14]This requirement of a property right is not necessary if the plaintiff charges denial of a liberty interest. But Bryan has not made that claim here.

either case, however, the sufficiency of the claim of entitlement must be decided by reference to state law").

The right that Bryan claims he was denied is his right to develop apartments on the land. He contends that when he signed the contract to purchase the land and put money down, that gave him an interest in the land. Bryan maintains that this interest entailed a right to use, which encompassed a right to develop apartments. That is what, according to him, the defendants interfered with.

The one and only Mississippi case that he relies on as support for the existence of such a right is Cole v. Haynes, 62 So.2d 779 (Miss. 1953). A careful analysis of that holding is therefore warranted.

In Cole, the issues were whether a contract between two parties was an option contract or a contract of sale, and if the latter, whether the buyer had an equitable lien on the property for the return of his down payment upon the seller's failure to make good title. Id. at 779. The parties had signed a contract, and the buyer paid $3,250 down. But the seller was not able to clear title to the property by the closing date. When the seller refused to return the down payment, the buyer sued. He claimed an equitable lien on the property in the amount of his down payment.

The only part of the holding that is relevant to our inquiry

16

is the nature of the interest the buyer secured.[15]  We believe the description of that interest, however, forecloses any possible recovery under a due process theory:

> 55 Am.Jur., Vendor and Purchaser, § 548, states that the general rule is that <u>a purchaser under an executory contract for sale and purchase of land is entitled to an equitable lien upon the land for the amount which he has paid upon the purchase price</u>, where the vendor is in default or unable to make good title.  Section 549 says this with reference to the nature and basis of the lien: '<u>The lien of a purchaser of land under an executory contract for the amount which he has paid is to secure to him the repayment of expenditures made in pursuance of the contract</u>.  The exact nature of this lien is not clear. . . .  It has been said that the basis of the lien is the well-known fundamental rule that in equity what is agreed to be done is regarded as done, so that from the time that a contract is made for the purchase of real estate, <u>the vendor is, in a sense, a trustee for the purchaser</u>, and the purchaser in a sense is the real owner of the land, <u>so that each, under the ordinary equitable rules, has a lien for his protection</u>.  <u>The whole practice in equity with reference to such contracts is clearly on the basis that the parties are under equitable obligations to each other</u>.'

<u>Id.</u> at 781 (emphasis added)(quoting 55 Am.Jur., Vendor and Purchaser, § 548).

The nature of the interest the buyer secures under <u>Cole</u> is extremely limited.  It is an interest in the land.  But what rights does that interest entail?  Merely a right to get the down payment back if the seller does not make good title.  This interest does

---

[15]Bryan has asserted, and the defendants do not appear to contest, that the contract in this case was one of sale rather than an option contract.

17

not give one the right to enter the land, to exclude others from the land, or to build anything on the land.

Thus, it is apparent that Bryan never had the right that he claims the defendants denied him.  The interest in the land that arose when he signed the contract to purchase did not give him the right to develop the land.  So the defendants did not deny him his right to develop apartments because he never had such a right in the first place.

Because Bryan has failed to establish the denial of a property right, his due process claims fail.[16]

B

Bryan next contends that the defendants's conduct violated 42 U.S.C. §§ 1985(3) and 1986.  These two sections are directed at conspiracies to interfere with civil rights.  The district court

---

[16]Bryan also contends that the city's demand that he cede a forty-foot buffer of the property in exchange for approval of his plan constituted a taking of property without just compensation. The district court, however, correctly held that this claim was not ripe because Bryan had failed to seek compensation from the state. In Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 194, 105 S.Ct. 3108, 3120-21, 87 L.Ed.2d 126 (1985), the Supreme Court held that "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation."  Mississippi has a procedure for obtaining compensation based on eminent domain takings, and Bryan failed to resort to it.  See Miss. Code Ann. §§ 11-27-1 et seq. (providing for a "court of eminent domain").

18

dismissed these claims because Bryan had failed to allege membership in a class recognizable under § 1985(3).

On appeal, Bryan asserts that he is a member of an identifiable class--multi-family developers. But in United Brotherhood of Carpenters and Joiners of America, Local 610, AFL-CIO v. Scott, 463 U.S. 825, 837-39, 103 S.Ct. 3352, 3360-61, 77 L.Ed.2d 1049 (1983), the Supreme Court held that § 1985(3) does not reach conspiracies motivated by economic or commercial animus. In this circuit, we require an allegation of a race-based conspiracy. Newberry v. East Texas State University, 161 F.3d 276, 281 n.2 (5th Cir. 1998). For that reason, Bryan's § 1985(3) claim fails. And because a valid § 1985 claim is a prerequisite to a § 1986 claim, that claim is also invalid. See id. at 281 n.3.

C

Finally, Bryan argues that the defendants violated his right to equal protection under the Fourteenth Amendment. Unfortunately, neither his complaint nor his brief lists the specific instances that he considers examples of violations of his equal protection rights. To the best we can discern, there are two types of violations that might be implicated here. First, Bryan appears to allege that the defendants applied the zoning standards, such as the height and water meter restrictions, unreasonably in his case by vetoing his applications based on a failure to comply with those standards. Second, Bryan charges that the "extraordinary" process

19

he faced, which included the unscheduled November 1993 meeting and the hiring of Southern Consultants to review his plan, violated his equal protection rights.

The first activity falls within the standard equal protection analysis. As a prerequisite to such a claim, the plaintiff must prove that similarly situated individuals were treated differently. Wheeler v. Miller, 168 F.3d 241, 252 (5th Cir. 1999). But Bryan has failed even to allege this. He does not provide an example of any developer who had these standards applied to him or her in a manner different from the way they were applied to him. Thus, the equal protection claim with respect to those actions fails.

The second type of conduct on the part of defendants does not fit into this "as applied" analytical framework as easily, but instead looks like an example of "selective enforcement." In Esmail v. Macrane, 53 F.3d 176, 178-79 (7th Cir. 1995), the Seventh Circuit considered a case in which city officials had used their powers to delay and frustrate an applicant's efforts to obtain a liquor license. That court treated the case as one of "selective prosecution," which is a type of equal protection claim recognized in this circuit as well. See Allred's Produce v. United States Department of Agriculture, 178 F.3d 743, 748 (5th Cir. 1999)(including all but personal vindictiveness); Stern v. Tarrant County Hospital District, 778 F.2d 1052, 1058 (5th Cir. 1985)(including all but personal vindictiveness). In the present

20

case, when the mayor independently sought to rezone the property and called the November 1993 unscheduled meeting, she was not applying standards in an unreasonable manner. Instead, she was selectively using her powers against a single party,[17] Bryan. This therefore looks like an case of selective enforcement.

But to successfully bring a selective prosecution or enforcement claim, a plaintiff must prove that the government official's acts were motivated by improper considerations, such as race, religion, or the desire to prevent the exercise of a constitutional right.[18] Allred's Produce, 178 F.3d at 748. Stern, 778 F.2d at 1058. Bryan's selective enforcement claim fails for that reason. He has never alleged any improper motive by the mayor or aldermen. Neither his complaint nor his brief explains why the

---

[17]In Willowbrook v. Olech, 120 S.Ct. 1073, 1074 (2000), the Supreme Court explained that "[o]ur cases have recognized successful equal protection claims brought by a "class of one." As we read this part of the holding, it merely stands for the proposition that single plaintiffs may bring equal protection claims. They need not proceed on behalf of an entire group. But this statement has nothing to do with whether they must assert membership in a larger protected class. The decision does not, therefore, alter our requirement of an improper motive, such as racial animus, for selective enforcement claims.

[18]For example, retaliation for an attempt to exercise one's religion or right to free speech would be expected to qualify. Esmail, 53 F.3d at 179. The Seventh Circuit has also included personal vindictiveness as an improper basis for selective enforcement in the equal protection context. Id. at 180. We have never specifically addressed whether such a motive would be enough to support an equal protection claim without some other class-based discrimination, but that issue is not before us here because Bryan has failed to allege it.

mayor and aldermen's motive to block his plan were improper. He does not allege that they did so because of his race, his religion, his attempts to assert his constitutional rights, or just personal vindictiveness. The most we can garner is that the mayor and aldermen acted in response to the public petition against the development. If the public opposition were based on improper motives, such as race, then it might be that responding as the mayor and aldermen did to block the development would have implicated constitutional rights. But Bryan has failed to allege any such motive. And, in a democratic republic, responding to the voice of the public is expected and is not, standing alone, a malevolent motive for selective enforcement purposes. For that reason, the district court's dismissal of this claim was appropriate.

V

For the reasons stated herein, the district court's decision is

A F F I R M E D.

22