# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 1, 2021

Lyle W. Cayce
Clerk

No. 20-40359

PRISCILLA VILLARREAL,

*Plaintiff—Appellant*,

*versus*

THE CITY OF LAREDO, TEXAS; WEBB COUNTY, TEXAS; ISIDRO
R. ALANIZ; MARISELA JACAMAN; CLAUDIO TREVINO, JR.; JUAN
L. RUIZ; DEYANRIA VILLARREAL; ENEDINA MARTINEZ;
ALFREDO GUERRERO; LAURA MONTEMAYOR; DOES 1-2,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 5:19-CV-48

Before OWEN, *Chief Judge*, and GRAVES and HO, *Circuit Judges*.*

JAMES C. HO, *Circuit Judge*:

If the First Amendment means anything, it surely means that a citizen journalist has the right to ask a public official a question, without fear of being

---

* Chief Judge Owen dissents and will file a forthcoming dissenting opinion.

No. 20-40359

imprisoned. Yet that is exactly what happened here: Priscilla Villarreal was put in jail for asking a police officer a question.

If that is not an obvious violation of the Constitution, it's hard to imagine what would be. And as the Supreme Court has repeatedly held, public officials are not entitled to qualified immunity for obvious violations of the Constitution.

The district court accordingly erred in dismissing Villarreal's First and Fourth Amendment claims on qualified immunity grounds. The district court also erred in dismissing her Fourteenth Amendment claim for failure to state a claim. We reverse in part and affirm in part and remand for further proceedings.

## I.

For purposes of this appeal, we accept the factual allegations stated in Villarreal's complaint as true. *See*, *e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## A.

Priscilla Villarreal is a journalist in Laredo, Texas. She regularly reports on local crime, missing persons, community events, traffic, and local government. But Villarreal is not a traditional journalist. Instead of publishing her stories in the newspaper, she posts them on her Facebook page. Instead of using a tape recorder to conduct interviews, she uses her cell phone to live-stream video footage of crime scenes and traffic accidents. Her reporting frequently includes colorful—and often unfiltered—commentary. Perhaps because of this, she is one of Laredo's most popular news sources, with more than 120,000 Facebook followers. *See*, *e.g.*, Simon Romero, *La Gordiloca: The Swearing Muckraker Upending Border Journalism*, N.Y. TIMES (Mar. 10, 2019), https://www.nytimes.com/2019/03/10/us

2

/gordiloca-laredo-priscilla-villarreal.html ("[Villarreal] is arguably the most influential journalist in Laredo, a border city of 260,000.").

Villarreal is not shy about criticizing law enforcement. For example, in 2015, law enforcement uncovered evidence of animal abuse on the property of a relative of Marisela Jacaman, Webb County's Chief Assistant District Attorney. Villarreal vocally denounced the district attorney's decision to recall the arrest warrant for Jacaman's relative on animal cruelty charges and instead pursue a civil settlement. On another occasion, Villarreal live-streamed Laredo Police Department (LPD) officers choking an arrestee during a traffic stop.

Not surprisingly, local law enforcement officials were less than enthused with Villarreal's reporting. During a meeting with Villarreal, Webb County District Attorney Isidro Alaniz told her that he did not appreciate her criticism of the decision to withdraw the arrest warrant for Chief Assistant District Attorney Jacaman's relative. On another occasion, an officer threatened to take Villarreal's cell phone when she was recording a crime scene from behind a barricade—while saying nothing to the other members of the media standing next to her.

**B.**

In April 2017, Villarreal published a story about a man who committed suicide. The story identified the man by name and revealed that he was an agent with the U.S. Border Patrol. Villarreal first uncovered this information from talking to a janitor who worked near the scene of the suicide. She then contacted LPD Officer Barbara Goodman, who confirmed the man's identity.

The following month, Villarreal published the last name of a family involved in a fatal car accident in Laredo. She first learned the family's identity from a relative of the family who saw a video that Villarreal had

posted.  Again, Villarreal contacted Officer Goodman, and again, the officer verified this information.

Six months later, two arrest warrants were issued for Villarreal for violating Texas Penal Code § 39.06(c).  According to Villarreal, local officials have never brought a prosecution under § 39.06(c) in the 27-year history of that provision—and Defendants do not contend otherwise.

Section 39.06(c) states that "[a] person commits an offense if, with intent to obtain a benefit . . . , he solicits or receives from a public servant information that: (1) the public servant has access to by means of his office or employment; and (2) has not been made public."  Tex. Penal Code § 39.06(c).  According to the affidavit in support of the arrest warrants, Villarreal solicited or received the names of the suicide victim and the traffic accident victims (which, according to the affidavit, was "nonpublic" information).  The affidavit further alleged that Villarreal benefitted from publishing this information before other news outlets, by gaining additional followers on her Facebook page.  Chief Assistant District Attorney Jacaman approved the arrest warrant application.

After learning about the warrant, Villarreal turned herself in.  During the booking process, Villarreal saw LPD officers taking pictures of her in handcuffs with their cell phones.  The officers mocked and laughed at her.  Villarreal was then detained at the Webb County Jail.

Villarreal filed a petition for a writ of habeas corpus in the Webb County district court.  In March 2018, a judge granted her petition and held that § 39.06(c) was unconstitutionally vague.  The government did not appeal.

She subsequently brought suit under 42 U.S.C. § 1983 against various LPD officers, Webb County prosecutors, Webb County, and the City of Laredo.  The suit alleged a pattern of harassment and retaliation by various

local officials, culminating in her arrest, in violation of her First, Fourth, and Fourteenth Amendment rights. She sought damages as well as injunctive and declaratory relief.

Defendants moved to dismiss all of her claims under Federal Rule of Civil Procedure 12(b)(6). The officials sought dismissal on grounds of qualified immunity and failure to state a claim, and the county and city sought dismissal under *Monell*. The district court granted the motion and dismissed all claims accordingly.

Villarreal appeals the dismissal of her claims against the officials under the First, Fourth, and Fourteenth Amendments. She also appeals the dismissal of her municipal liability claims against the City of Laredo, but not her claims against Webb County.

We review de novo a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6). *Sw. Bell Tel., LP v. City of Houston*, 529 F.3d 257, 260 (5th Cir. 2008). To survive a Rule 12(b)(6) motion to dismiss, Villarreal must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). With respect to the defense of qualified immunity, Villarreal must plead specific facts that defeat that defense with equal specificity. *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012).

## II.

Villarreal alleges that Defendants violated her First Amendment rights in two ways—first, by infringing on her constitutional right to ask questions of public officials, and second, by arresting her in retaliation for her exercise of First Amendment rights. We address each in turn.

No. 20-40359

## A.

The district court dismissed her First Amendment infringement claim against various officials on qualified immunity grounds, finding that any violation was not clearly established at the time. We disagree.

To defeat qualified immunity at the motion to dismiss stage, Villarreal must allege, first, that the officials violated her First Amendment rights, and second, that their actions were objectively unreasonable in light of clearly established law. *See*, *e.g.*, *Powers v. Northside Indep. Sch. Dist.*, 951 F.3d 298, 305–06 (5th Cir. 2020). The crucial question in this inquiry is whether "a reasonable official would understand that what he is doing violates [a constitutional] right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "The central concept is that of 'fair warning.'" *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

Ordinarily, a plaintiff defeats qualified immunity by citing governing case law finding a violation under factually similar circumstances. But that is not the only way to defeat qualified immunity. "Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Hope*, 536 U.S. at 741.

"[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id*. "'[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.'" *Id*. (second alteration in original) (quoting *Anderson*, 483 U.S. at 640).

In *Hope*, prison guards handcuffed a prisoner to a hitching post for seven hours in the sun with little water. *Id.* at 734–35. They taunted him

6

about his thirst, giving water to some dogs, before bringing the water cooler closer to the prisoner and kicking the cooler over, spilling the water onto the ground. *Id.* at 735. The guards also refused to allow him to use a restroom. *Id.*

The Court acknowledged that there was no "materially similar" case finding an Eighth Amendment violation under those particular circumstances. *Id.* at 739–41. But the Court denied qualified immunity anyway, based on "[t]he obvious cruelty inherent" in the guards' conduct. *Id.* at 745.

Similarly, in *Taylor v. Riojas*, 141 S. Ct. 52 (2020) (per curiam), two prison cells contained massive amounts of feces over a period of six days. *Id.* at 53. Again, there was no binding case on point involving those particular factual circumstances. But the Court nevertheless denied qualified immunity, reasoning that "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house Taylor in such deplorably unsanitary conditions for such an extended period of time." *Id.*

Perhaps the decision most analogous to this appeal is *Sause v. Bauer*, 138 S. Ct. 2561 (2018) (per curiam). There, police officers entered a woman's living room in response to a noise complaint. When she knelt down to pray, they ordered her to stop, despite the lack of any apparent law enforcement need. *Id.* at 2562. She brought suit against the officers alleging, *inter alia*, a violation of the Free Exercise Clause. *Id.* The Tenth Circuit granted qualified immunity, reasoning that any violation was not clearly established because "Sause d[id]n't identify a single case in which this court, or any other court for that matter, has found a First Amendment violation based on a factual scenario even remotely resembling the one we encounter here." *Sause v. Bauer*, 859 F.3d 1270, 1275 (10th Cir. 2017).

The Court reversed the Tenth Circuit's grant of qualified immunity and remanded for further proceedings, holding that "[t]here can be no doubt that the First Amendment protects the right to pray," and that "[p]rayer unquestionably constitutes the 'exercise' of religion." *Sause*, 138 S. Ct. at 2562.

The point is this:  The doctrine of qualified immunity does not always require the plaintiff to cite binding case law involving identical facts.  An official who commits a patently "obvious" violation of the Constitution is not entitled to qualified immunity. *Hope*, 536 U.S. at 745.

That principle should have precluded dismissal of the various constitutional claims presented here.  Just as it is obvious that Mary Anne Sause has a constitutional right to pray, it is likewise obvious that Priscilla Villarreal has a constitutional right to ask questions of public officials.  Yet according to her complaint, Defendants arrested and sought to prosecute Villarreal for doing precisely that—asking questions of public officials.

This is not just an obvious constitutional infringement—it's hard to imagine a more textbook violation of the First Amendment.

If the freedom of speech secured by the First Amendment includes the right to curse at a public official, then it surely includes the right to politely ask that official a few questions as well. *See*, *e.g.*, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 569 (1942) ("'You are a God damned racketeer' and 'a damned Fascist'"); *Sandul v. Larion*, 119 F.3d 1250, 1255 (6th Cir. 1997) ("In 1990 when [the defendant] was arrested for his use of the 'f-word,' it was clearly established that speech is entitled to First Amendment protection."); *Buffkins v. City of Omaha*, 922 F.2d 465, 467 (8th Cir. 1990) ("I will have a nice day, asshole.").

If freedom of the press guarantees the right to publish information from the government, then it surely guarantees the right to ask the

8

government for that information in the first place. *See*, *e.g.*, *In re Express-News Corp.*, 695 F.2d 807, 808 (5th Cir. 1982) ("news-gathering is entitled to [F]irst [A]mendment protection, for 'without some protection for seeking out the news, freedom of the press could be eviscerated'") (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972)); *The Florida Star v. B.J.F.*, 491 U.S. 524, 538 (1989) ("That appellant gained access to the information in question through a government news release makes it especially likely that, if liability were to be imposed, self-censorship would result.").

Put simply:  If the government cannot punish someone for *publishing* the Pentagon Papers, how can it punish someone for simply *asking* for them? *See New York Times Co. v. United States*, 403 U.S. 713 (1971) (per curiam).

Finally, if the First Amendment safeguards the right to petition the government for a redress of grievances, then it surely safeguards the right to petition the government for information.  As one of our colleagues once noted, "[t]he original design of the First Amendment petition clause . . . included a governmental duty to consider petitioners' grievances"—not the right to detain the petitioner.  Stephen A. Higginson, Note, *A Short History of the Right to Petition Government for the Redress of Grievances*, 96 YALE L.J. 142, 142–43 (1986).

So it should be patently obvious to any reasonable police officer that the conduct alleged in the complaint constitutes a blatant violation of Villarreal's constitutional rights.  And that should be enough to defeat qualified immunity.  The Institute for Justice, a respected national public interest law firm, puts the point well in its amicus brief:  There is a big difference between "split-second decisions" by police officers and "premeditated plans to arrest a person for her journalism, especially by local officials who have a history of targeting her because of her journalism."  We agree that the facts alleged here present an especially weak basis for invoking

qualified immunity.  For "[w]hen it comes to the First Amendment, . . . we are concerned about government chilling the citizen—not the other way around."  *Horvath v. City of Leander*, 946 F.3d 787, 802 (5th Cir. 2020) (Ho, J., concurring in the judgment in part and dissenting in part).  *Cf. Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., respecting denial of cert.) ("But why should university officers, who have time to make calculated choices about enacting or enforcing unconstitutional policies, receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting?").

Defendants respond that the officials were simply enforcing a statute. But "some statutes are so obviously unconstitutional that we will require officials to second-guess the legislature and refuse to enforce an unconstitutional statute—or face a suit for damages if they don't."  *Lawrence v. Reed*, 406 F.3d 1224, 1233 (10th Cir. 2005).  We agree with Judge McConnell and our other sister circuits that police officers can invoke qualified immunity by "rely[ing] on statutes that authorize their conduct— but not if the statute is obviously unconstitutional."  *Id.* at 1232.  We do not grant qualified immunity where the official attempts to hide behind a statute that is "'so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws.'"  *Carey v. Nevada Gaming Control Bd.*, 279 F.3d 873, 881 (9th Cir. 2002) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979)).  *See also, e.g.*, *Guillemard-Ginorio v. Contreras-Gómez*, 490 F.3d 31, 40–41 (1st Cir. 2007) (denying qualified immunity where statute allowed officials to suspend a professional license without a hearing in violation of the Due Process Clause); *Leonard v. Robinson*, 477 F.3d 347, 359, 361 (6th Cir. 2007) (denying qualified immunity where statute criminalized cursing by the name of God and indecent language in front of women or children); *Lawrence*, 406 F.3d at 1233 (denying qualified immunity where derelict vehicle ordinance provided "no hearing

whatsoever" because that was a "sufficiently obvious" violation of due process); *Vives v. City of New York*, 405 F.3d 115, 118 (2nd Cir. 2005) (no qualified immunity where official relies on a law "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws") (quoting *Connecticut ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 103 (2nd Cir. 2003)); *Lederman v. United States*, 291 F.3d 36, 47 (D.C. Cir. 2002) (similar); *Aubin v. Columbia Cas. Co.*, 272 F. Supp. 3d 828, 839 (M.D. La. 2017) ("[N]o reasonable officer could rely on Louisiana's public intimidation statute to arrest a person who threatens to have them fired.").

Texas Penal Code § 39.06(c) is one of those statutes. Accordingly, we join our sister circuits in holding that the doctrine of qualified immunity does not permit government officials to invoke patently unconstitutional statutes like § 39.06(c) to avoid liability for their actions.

\* \* \*

It should be obvious to any reasonable police officer that locking up a journalist for asking a question violates the First Amendment. Indeed, even Captain Lorenzo, the stubborn police chief in *Die Hard 2*, acknowledged: "Now personally, I'd like to lock every [expletive] reporter out of the airport. But then they'd just pull that 'freedom of speech' [expletive] on us and the ACLU would be all over us." DIE HARD 2 (1990).

Captain Lorenzo understood this. The officers in Laredo should have, too. *Cf. Dickerson v. United States*, 530 U.S. 428, 443 (2000) ("*Miranda* has become embedded in routine police practice to the point where the warnings have become part of our national culture."). The complaint here alleges an obvious violation of the First Amendment. The district court erred in holding otherwise.

## B.

Turning to Villarreal's First Amendment retaliation theory:  To establish such a claim, she "must show that (1) [she] w[as] engaged in constitutionally protected activity, (2) the defendants' actions caused [her] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against [her] exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) (citations omitted).

Notwithstanding that the second element turns on "a person of ordinary firmness," this court has held that "a retaliation claim requires some showing that *the plaintiffs'* exercise of free speech has been curtailed." *Id.* at 259 (emphasis added) (citing cases).  The court found that the plaintiffs there demonstrated curtailment when they asserted that they "backed off from direct involvement in helping expose unlawful practices in the constable's office." *Id.* at 260. *See also McLin v. Ard*, 866 F.3d 682, 697 (5th Cir. 2017) (holding that plaintiff's "allegation of 'great personal damage[]' . . . d[id] not demonstrate that he reduced or changed his exercise of free speech in any way.").

Villarreal fails to allege that *her own* "exercise of free speech has been curtailed." *Keenan*, 290 F.3d at 259.  She alleges that she lost sleep, suffered reputational damage, became physically ill, was detained, and feared future interference from officials.  But these allegations do not show that Villarreal curtailed her speech.  To the contrary, as Defendants point out, Villarreal has continued reporting since her arrest—consistent with the highest traditions of fearless journalism.

In response, Villarreal contends that "a chilling injury does not require the injured party to stop exercising her First Amendment rights."

That is the law in other circuits—and perhaps for good reason—but it is not the law of this circuit. *Compare Keenan*, 290 F.3d at 259 ("[A] retaliation claim requires some showing that the plaintiffs' exercise of free speech has been curtailed."), *with Smith v. Plati*, 258 F.3d 1167, 1177 (10th Cir. 2001) ("The focus . . . is upon whether a *person of ordinary firmness* would be chilled, rather than whether the particular plaintiff is chilled."), *and Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) ("[I]t would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity.").

We are duty-bound to follow our circuit precedent. Accordingly, we must hold that Villarreal has failed to sufficiently plead a First Amendment retaliation claim.[1]

* * *

Although Villarreal has not pleaded an actionable First Amendment retaliation claim under the standards set forth in our circuit precedent, she has articulated a viable First Amendment theory based on the officers' infringement of her constitutional right to ask questions of public officials. The district court accordingly erred in dismissing her First Amendment claim.

Villarreal seeks not only damages but also injunctive and declaratory relief for her First Amendment claim. We agree with the district court that she fails to allege a risk of future injury as required to establish standing for

---

[1] Villarreal also brings a retaliatory investigation claim. But this circuit does not recognize such a claim. *See Colson v. Grohman*, 174 F.3d 498, 512 (5th Cir. 1999) ("[The plaintiff] has alleged only that she was the victim of criticism, an *investigation* (or an attempt to start one), and false accusations: all harms that, while they may chill speech, are not actionable under our First Amendment retaliation jurisprudence.") (emphasis added).

No. 20-40359

injunctive and declaratory relief. To the contrary, Defendants have not appealed the grant of Villarreal's petition for a writ of habeas corpus by the Webb County district court. Nor have they sought to arrest or investigate her in the two years since that ruling.

**III.**

We turn to Villarreal's Fourth Amendment wrongful arrest claim. To prevail on this claim, Villarreal must show that she was seized and that the seizure was unreasonable because it lacked probable cause. *See*, *e.g.*, *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001) ("The 'constitutional tort[ ]' of false arrest . . . require[s] a showing of no probable cause."). Defendants do not dispute that Villarreal's surrender in response to the arrest warrants was a seizure. *See McLin*, 866 F.3d at 694 ("McLin's seizure occurred when he surrendered to the arrest warrants and [the sheriff's office] exercised authority consistent with the warrants.").

"Probable cause exists when all of the facts known by a police officer 'are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense.'" *Texas v. Kleinert*, 855 F.3d 305, 316 (5th Cir. 2017) (quoting *United States v. Castro*, 166 F.3d 728, 733 (5th Cir. 1999) (en banc)). Defendants argue they are entitled to qualified immunity because their arrest warrant sufficiently alleges a violation of § 39.06(c), which they obtained from a magistrate judge.

But "the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness." *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012). Even when officers obtain an arrest warrant from a magistrate, we ask "whether a reasonably well-trained officer in [the defendants'] position would have known that his affidavit failed to establish probable cause and that he should not have applied for a warrant." *Jennings*

14

*v. Joshua Indep. Sch. Dist.*, 877 F.2d 313, 317 (5th Cir. 1989) (quoting *Malley v. Briggs*, 475 U.S. 335, 345 (1986)).  "Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Malley*, 475 U.S. at 341.

As explained above, a reasonably well-trained officer would have understood that arresting a journalist for merely asking a question clearly violates the First Amendment.  "A government official may not base her probable cause determination on an 'unjustifiable standard,' such as speech protected by the First Amendment." *Mink v. Knox*, 613 F.3d 995, 1003–04 (10th Cir. 2010) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). *See also Swiecicki v. Delgado*, 463 F.3d 489, 498 (6th Cir. 2006) ("[A]n officer may not base his probable-cause determination on speech protected by the First Amendment.").

Just as the First Amendment violation alleged in the complaint was obvious for purposes of qualified immunity, so too the Fourth Amendment violation alleged here.  The district court therefore erred in dismissing Villarreal's Fourth Amendment claim.

## IV.

Next, we address Villarreal's selective enforcement claim under the Equal Protection Clause of the Fourteenth Amendment.  "[T]o successfully bring a selective . . . enforcement claim, a plaintiff must prove that the government official's acts were motivated by improper considerations, such as race, religion, or the desire to prevent the exercise of a constitutional right."  *Bryan v. City of Madison*, 213 F.3d 267, 277 (5th Cir. 2000). "[R]etaliation for an attempt to exercise one's religion or right to free speech would be expected to qualify." *Id.* at 277 n.5.

"As a prerequisite to such a claim, the plaintiff must prove that similarly situated individuals were treated differently." *Id.* at 276 (citing

*Wheeler v. Miller*, 168 F.3d 241, 252 (5th Cir. 1999)).  The district court here dismissed Villarreal's selective enforcement claim for failure to identify similarly situated individuals that could have been arrested, but were not.  So we begin our analysis there.

Defining the universe of similarly situated individuals is a "case specific" inquiry—one that "requires us to consider 'the full variety of factors that an objectively reasonable . . . decisionmaker would have found relevant in making the challenged decision.'" *Lindquist v. City of Pasadena*, 669 F.3d 225, 234 (5th Cir. 2012) (alteration in original) (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1203 (11th Cir. 2007)).  In *Lindquist*, we explained that, when a case "involves the application of an ordinance or statute, the plaintiff's and comparators' relationships with the ordinance at issue will generally be a relevant characteristic for purposes of the similarly-situated analysis."  669 F.3d at 234.  So, for example, in *Beeler v. Rounsavall*, 328 F.3d 813 (5th Cir. 2003), a store alleged that it was treated differently than another store located nearby.  *Id.* at 816.  The court held that "the relevant question [was] whether the two stores were similarly situated under [the relevant provision of] the Code," not whether they were geographically proximate.  *Id.* at 817.

Under Defendants' interpretation of § 39.06(c), any journalist who asks a public official a question regarding nonpublic information commits a crime.  Villarreal's complaint sufficiently alleges that countless journalists have asked LPD officers all kinds of questions about nonpublic information.  Yet they were never arrested.

Specifically, she alleges a similarly situated group that includes: "(a) those who had asked for or received information from local law enforcement officials, and (b) persons who published truthful and publicly-accessible information on a newsworthy matter."  She points to "local professional

newspaper journalists, local professional broadcast journalists, and citizens who published on matters of local public concern." She further alleges that Defendants "also knew that members of the local media regularly asked for and received information from LPD officials relating to crime scenes and investigations, traffic accidents, and other LPD matters." Finally, Villarreal alleges, and Defendants concede, that LPD had never before arrested any person under § 39.06(c).

It is true that Villarreal did not name a specific journalist who solicited or received nonpublic information from the LPD in her complaint. When evaluating whether Villarreal survives a motion to dismiss under Rule 12(b)(6), however, we must draw all reasonable inferences in favor of Villarreal. *See*, *e.g.*, *Woodard v. Andrus*, 419 F.3d 348, 351 (5th Cir. 2005) ("The complaint must be liberally construed, with all reasonable inferences drawn in the light most favorable to the plaintiff.").

We have no difficulty observing that journalists commonly ask for nonpublic information from public officials, and that Villarreal was therefore entitled to make that same reasonable inference. Yet Defendants chose to arrest Villarreal—and only Villarreal—for violating § 39.06(c). We accordingly conclude that Villarreal has sufficiently pled the existence of similarly situated journalists who were not arrested for violating § 39.06(c).

The district court reached the opposite conclusion, holding that Villarreal "fail[ed] to allege any facts indicating that Defendants failed to enforce § 39.06(c) against any other person where a similar situation existed." The court offered various rationales to justify its conclusion. None of them are plausible.

First, the district court reiterated that the officers had "probable cause to arrest [her]," because they had "objectively reasonable grounds to find probable cause that [Villarreal] violated § 39.06(c)." But probable cause is

not a bar to a selective enforcement claim. "The courts have long held that a selective enforcement claim may be available even where there is probable cause for prosecution." *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997) (citing *Wayte*, 470 U.S. at 607; *Oyler v. Boles*, 368 U.S. 448, 455–56 (1962)). *See also Bradley v. United States*, 299 F.3d 197, 205 (3rd Cir. 2002) ("The fact that there was no Fourth Amendment violation does not mean that one was not discriminatorily selected for a search.").

Second, the district court found that local journalists were not similarly situated to Villarreal because she was arrested for communicating with Officer Goodman—and not with Jose Beza, LPD's official spokesman. The district court reasoned that local journalists are similarly situated to Villarreal only if they too "solicited or received information from Goodman"—or at least from "some other unofficial or unsanctioned source of information within the police department"—but not if they solicited information from LPD's designated spokesman. But of course, LPD has never claimed that it has a policy of arresting every journalist who asks questions about nonpublic information from LPD officials other than the department's designated spokesmen. Nor is there anything in § 39.06(c) to justify such a distinction.

Finally, the district court found that Villarreal's allegations could not establish a discriminatory effect because "it would be equally plausible to infer that Defendants had never before encountered circumstances giving rise to potential prosecution under the statute." That is implausible on its face. Defendants' interpretation of § 39.06(c) criminalizes routine reporting. It is not "equally plausible" that the only journalist to ever ask questions of Laredo public officials was Villarreal.

The district court accordingly erred in dismissing Villarreal's selective enforcement claim for failure to identify similarly situated

individuals. We of course make no comment on whether Villarreal will ultimately prevail on her selective enforcement claim—that is for the district court to decide in the first instance on remand.

## V.

As for Villarreal's remaining claims: She also brings a claim for conspiracy to violate her constitutional rights under § 1983. Given our conclusion that the district court erred in dismissing her First, Fourth, and Fourteenth Amendment claims, we remand her conspiracy claim as well.

Finally, we address Villarreal's municipal liability claim against the City of Laredo. "[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy [or custom]; and a violation of constitutional rights whose 'moving force' is th[at] policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)). The district court held that Villarreal failed to identify an official policy or custom made by a final policymaker. We agree. Although Villarreal repeatedly refers to an "official city policy or custom" of retaliating against her for her reporting, she fails to sufficiently allege either. Villarreal does not point to any ordinance, statute, statement, or regulation directing city employees to retaliate against her. *See Doe v. United States*, 831 F.3d 309, 318 (5th Cir. 2016) (noting that "[a]n official policy is usually evidenced by 'duly promulgated policy statements, ordinances or regulations'") (quoting *Piotrowski*, 237 F.3d at 579). Nor does Villarreal sufficiently allege a "custom." Although she alleges "a persistent and widespread practice of City officials and employees engaging in retaliatory acts against [her]," such a "persistent, widespread practice" must be "so common and well settled as to constitute a custom that fairly represents municipal policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc). Villarreal does

not allege that city employees retaliated against, investigated, or arrested anyone else because of their speech. *See Culbertson v. Lykos*, 790 F.3d 608, 628 (5th Cir. 2015) (holding that the plaintiffs failed to allege a "widespread practice" of retaliation because they "offered no evidence that similar retaliation had victimized others."). We affirm the district court's judgment dismissing Villarreal's municipal liability claim against the City of Laredo.[2]

\* \* \*

It is not a crime to be a journalist. As the Institute for Justice rightly observes, the position urged by the City of Laredo in this case is "dangerous to a free society," for "[i]t assumes that the government can choose proper and improper channels for newsgathering—indeed, that the government can decide what is and is not newsworthy." *See also Jobe v. Nat'l Transp. Safety Bd.*, 1 F.4th 396, 410 (5th Cir. 2021) (Ho, J., dissenting) ("Open government is a founding principle of our country.").

We reverse the judgment of the district court dismissing Villarreal's First, Fourth, and Fourteenth Amendments claims, as well as her civil conspiracy claims. We affirm the district court's judgment dismissing Villarreal's municipal liability claims against the City of Laredo. We remand the case for further proceedings consistent with this opinion.

In issuing this decision, we acknowledge that the constitutionality of Texas Penal Code § 39.06(c) has been called into question in this case, but it does not appear that either the Plaintiff or the district court has so notified the Attorney General of Texas. *See* 28 U.S.C. § 2403(b); FED. R. APP. PROC. 44(b). Accordingly, it is ordered that the Clerk of this Court shall

---

[2] Villarreal also appeals the district court's denial of her request for a declaratory judgment on her claim against the City of Laredo. Because she fails to establish municipal liability, she is not entitled to a declaratory judgment.

No. 20-40359

promptly file with the Attorney General of Texas a certificate in conformity with 28 U.S.C. § 2403(b), and that the entry of judgment and the mandate of this court be withheld for a period of sixty days from the date of this opinion in order to afford the Attorney General an opportunity to take such steps as he may deem advisable. *See*, *e.g.*, *Thatcher v. Tennessee Gas Transmission Co.*, 180 F.2d 644, 648 n.7 (5th Cir. 1950); *Bridges v. Phillips Petroleum Co.*, 733 F.2d 1153, 1156 n.7 (5th Cir. 1984); *Jones v. City of Lubbock*, 727 F.2d 364, 372 (5th Cir. 1984).